NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11800

CHRIS E. MALING <u>vs</u>.  FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP, & others.[1]


Suffolk.     September 8, 2015. - December 23, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk,
& Hines, JJ.



<u>Patent</u>.  <u>Conflict of Interest</u>.  <u>Attorney at Law</u>, Conflict of
interest, Attorney-client relationship, Representation of
differing interests.



<u>Civil action</u> commenced in the Superior Court Department on
April 25, 2013.

A motion to dismiss was heard by <u>Janet L. Sanders</u>, J.

The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


<u>Thomas M. Bond</u> for the plaintiff.
<u>Erin K. Higgins</u> (<u>Christopher K. Sweeney</u> with her) for the
defendants.
<u>Paul A. Stewart</u>, of California, & <u>Sara E. Hirshon</u>, for
Knobbe, Martens, Olson & Bear, LLP, & others, amici curiae,
submitted a brief.

---

[1] Lawrence R. Robins, Eric P. Raciti, and Matthew R. Van
Eman.

Heather B. Repicky & Lauren E. Ingegneri, for Boston Patent Law Association, amicus curiae, submitted a brief.

CORDY, J.  In this case we consider whether an actionable conflict of interest arises under Mass. R. Prof. C. 1.7, as appearing in 471 Mass. 1335 (2015), when attorneys in different offices of the same law firm simultaneously represent business competitors in prosecuting patents on similar inventions, without informing them or obtaining their consent to the simultaneous representation.[2]

The plaintiff, Chris E. Maling, engaged the defendant law firm Finnegan, Henderson, Farabow, Garrett & Dunner, LLP (Finnegan), including the three individual attorneys named in this suit, to represent him in connection with the prosecution of patents for Maling's inventions for a new screwless eyeglass. After obtaining his patents, Maling learned that Finnegan had been simultaneously representing another client that competed with Maling in the screwless eyeglass market.  Maling then commenced this action, alleging harm under various legal theories resulting from Finnegan's failure to disclose the alleged conflict of interest.  A judge in the Superior Court

---

[2] We acknowledge the amicus briefs submitted by the Boston Patent Law Association and by Knobbe, Martens, Olson & Bear, LLP; Honigman Miller Schwartz and Cohn LLP; Nixon & Vanderhye P.C.; Lewis Roca Rothgerber LLP; Schiff Hardin LLP; Steptoe & Johnson LLP; Snell & Wilmer LLP; Barnes & Thornburg LLP; Pillsbury Winthrop Shaw Pittman LLP; Verrill Dana LLP; and Morrison & Foerster LLP.

dismissed Maling's complaint for failure to state a claim under Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974). Maling appealed, and we transferred the case to this court on our own motion. We conclude that the simultaneous representation by a law firm in the prosecution of patents for two clients competing in the same technology area for similar inventions is not a per se violation of Mass. R. Prof. Conduct 1.7. We further conclude that based on the facts alleged in his complaint, Maling failed to state a claim for relief. Accordingly, we affirm the judgment of dismissal.

1. Background. In 2003, Maling engaged Finnegan to perform legal services in connection with the filing and prosecution of patents for Maling's inventions for a new screwless eyeglass, including a screwless eyeglass hinge block design. Finnegan prepared patent applications for Maling's inventions after ordering "prior art" searches. Over the next several years, Finnegan successfully obtained four separate patents for Maling.

Attorneys in Finnegan's Boston office represented Maling from approximately April, 2003, to May, 2009.[3] During this period of time, attorneys in Finnegan's Washington, D.C., office

---

[3] Finnegan, Henderson, Farabow, Garrett & Dunner, LLP (Finnegan), withdrew its representation of Chris E. Maling before the United States Patent and Trademark Office (USPTO) on May 20, 2009; however, it is not clear from the record when the firm and Maling terminated their relationship.

represented Masunaga Optical Manufacturing Co., Ltd. (Masunaga), a Japanese corporation that also sought patents for its screwless eyeglass technology. Upon learning of Finnegan's representation of Masunaga, Maling brought suit, asserting claims stemming from the alleged conflict of interest that arose from Finnegan's simultaneous representation of both clients.[4] We describe the allegations in Maling's complaint germane to our decision.

Maling alleges that he engaged Finnegan to "file and prosecute a patent for [his] inventions for a new screw-less eyeglass, including without limitation, his invention of a 'screwless' eyeglasses hinge block design," and that in September, 2003, Finnegan ordered prior art searches relating to Maling's inventions.[5] Maling alleges that Finnegan "belatedly"

---

[4] The original complaint was filed by Maling and his company, The Formula, LLC, in the United States District Court for the District of Massachusetts in April, 2012. It was dismissed following the United States Supreme Court's decision in Gunn v. Minton, 133 S. Ct. 1059, 1068 (2013), which held that legal malpractice claims arising from representation in patent proceedings are not within the exclusive subject matter jurisdiction of the Federal courts. Maling refiled his case in the business litigation section of the Massachusetts Superior Court in April, 2013. After judgment entered dismissing the complaint on October 29, 2013, notices of appeal were filed by both plaintiffs, but no filing fee was paid in the Appeals court on behalf of The Formula, LLC. Therefore, Maling is the sole appellant.

[5] Prior art is "the collection of everything in a particular art or science that pre-dates the patent-in-suit." Princeton Biochemicals, Inc. vs. Beckman Coulter, Inc., No. 96-5541

commenced preparation of a patent application for his inventions in or about May, 2004, and that it "[inexplicably] took [fourteen] months" to do so. Maling also alleges that Finnegan filed patent applications for Masunaga more quickly than it did for him. At the same time, Maling acknowledges that Finnegan successfully obtained patents for his inventions. Maling further claims that he paid Finnegan in excess of $100,000 for its services, and that he invested "millions of dollars" to develop his product. He claims he would not have made this investment had Finnegan "disclosed its conflict of interest and/or its work on the competing Masunaga patent." He further alleges that the Masunaga applications are very similar to the Maling applications, and that Finnegan knew it was performing work in the "same patent space" for both clients. Maling also alleges that he was harmed when Finnegan, in 2008, declined to provide him with a legal opinion addressing similarities between the Masunaga patents and the Maling patents. Because Finnegan did not provide the legal opinion Maling claims, he was unable to obtain funding for his invention, and his product was otherwise unmarketable on account of its similarities to the Masunaga device; as a result, his patents and inventions have diminished in value. In sum, Maling contends, Finnegan's

---

(D.N.J. June 17, 2004), aff'd, 411 F.3d 1332 (Fed. Cir. 2005). See 35 U.S.C. § 102 (2012).

simultaneous representation of both clients, as well as its failure to disclose the alleged conflict, resulted in "great harm" and "tremendous financial hardship" for Maling.

Finnegan moved to dismiss Maling's complaint for failure to state a claim under Mass. R. Civ. P. 12 (b) (6). The motion was granted in October, 2013, and Maling appealed. We then transferred the case to this court on our own motion.

2. Discussion. We review the sufficiency of Maling's complaint de novo, taking as true the factual allegations set forth therein and drawing all inferences in his favor. Curtis v. Herb Chambers I-95, Inc., 458 Mass. 674, 676 (2011). "[W]e look beyond the conclusory allegations in the complaint and focus on whether the factual allegations plausibly suggest an entitlement to relief." Id., citing Iannacchino v. Ford Motor Co., 451 Mass. 623, 635-636 (2008).

Maling's complaint sets forth four bases for relief: (1) breach of fiduciary duty; (2) legal malpractice; (3) unfair or deceptive practices in violation of G. L. c. 93A; and (4) "inequitable conduct" before the United States Patent and Trademark Office (USPTO). Because each count hinges on the existence of an undisclosed conflict of interest arising from Finnegan's representation of both Maling and Masunaga, we focus our inquiry on whether, under the facts alleged, an actionable

conflict arose in violation of the Massachusetts Rules of Professional Conduct.

Rule 1.7 of the Massachusetts Rules of Professional Conduct, which applies to conflicts of interests between current clients, governs the issues in this case.[6]  By its terms, rule 1.7, with limited exceptions, provides that a lawyer shall not represent a client if the representation is "directly adverse to another client," Mass. R. Prof. C. 1.7 (a) (1), or where "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer."  Mass. R. Prof. C. 1.7 (a) (2).  The purpose of rule 1.7 is twofold.  It serves as a "prophylactic [measure] to protect confidences that a client may have shared with his or her attorney . . . [and] safeguard[s] loyalty as a feature of the lawyer-client relationship."  SWS Fin. Fund A v. Salomon Bros. Inc., 790 F. Supp. 1392, 1401 (N.D. Ill. 1992). [7]

---

[6] Since Maling's complaint was filed in 2012, the Massachusetts Rules of Professional Conduct have been revised and updated.  Because the substance of rule 1.7 remains unchanged, we analyze Maling's claims against the most recent version of the rules, published in 2015.  See Mass. R. Prof. C. 1.7, as appearing in 471 Mass. 1335 (2015).

[7] The USPTO also sets standards of conduct for attorneys who practice before it.  In 2013, the USPTO adopted new ethics rules based on the American Bar Association's Model Rules of

Professional Conduct.  See 78 Fed. Reg. 20,180, 20,180 (2013). The current regulation on concurrent conflicts of interest, 37 C.F.R. § 11.107 (2013), is virtually identical in language to Mass. R. Prof. C. 1.7.

At the time this action was brought, concurrent conflicts of interest were governed by 37 C.F.R. § 10.66 (2012) (entitled, "Refusing to accept or continue employment if the interests of another client may impair the independent professional judgment of the practitioner"), which provided:

"(a) A practitioner shall decline proffered employment if the exercise of the practitioner's independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve the practitioner in representing differing interests, except to the extent permitted under paragraph (c) of this section.

"(b) A practitioner shall not continue multiple employment if the exercise of the practitioner's independent professional judgment in behalf of a client will be or is likely to be adversely affected by the practitioner's representation of another client, or if it would be likely to involve the practitioner in representing differing interests, except to the extent permitted under paragraph (c) of this section.

"(c) In the situations covered by paragraphs (a) and (b) of this section a practitioner may represent multiple clients if it is obvious that the practitioner can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of the practitioner's independent professional judgment on behalf of each.

"(d) If a practitioner is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner, or associate, or any other practitioner affiliated with the practitioner or the practitioner's firm, may accept or continue such employment unless otherwise ordered by the Director or Commissioner."

In the practice of patent law, the simultaneous representation of clients competing for patents in the same technology area is sometimes referred to as a "subject matter conflict."  See, e.g., Dolak, Recognizing and Resolving Conflicts of Interest in Intellectual Property Matters, 42 IDEA 453, 463 (2002); Hricik, Trouble Waiting to Happen: Malpractice and Ethical Issues in Patent Prosecution, 31 AIPLA Q.J. 385, 412 (2003) (Hricik).  Subject matter conflicts do not fit neatly into the traditional conflict analysis.  Maling advocates for a broad interpretation of rule 1.7 that would render all subject matter conflicts actionable, per se violations.  We disagree. Rather, we conclude that although subject matter conflicts in patent prosecutions often may present a number of potential legal, ethical, and practical problems for lawyers and their clients, they do not, standing alone, constitute an actionable conflict of interest that violates rule 1.7.

a.  Adverse representation under rule 1.7 (a) (1). Representation is "directly adverse" in violation of rule 1.7 (a) (1) when a lawyer "act[s] as an advocate in one matter against a person the lawyer represents in some other matter, even when the matters are wholly unrelated."  Mass. R. Prof. C. 1.7 comment 6.  In other words, "[a] law firm that represents client A in the defense of an action may not, at the same time, be counsel for a plaintiff in an action brought against client

A, at least without the consent of both clients."  McCourt Co.
v. FPC Props., Inc., 386 Mass. 145, 145 (1982).

In the instant case, Maling and Masunaga were not
adversaries in the traditional sense, as they did not appear on
opposite sides of litigation.  Rather, they each appeared before
the USPTO in separate proceedings to seek patents for their
respective screwless eyeglass devices.

Maling contends, however, that he and Masunaga were
directly adverse within the meaning of rule 1.7 (a) (1) because
they were competing in the "same patent space."  We disagree
that the meaning of "directly adverse" stretches so far.  The
rules of professional conduct make clear that

> "simultaneous representation in unrelated matters of
> clients whose interests are only economically adverse,
> such as representation of competing economic
> enterprises in unrelated litigation, does not
> ordinarily constitute a conflict of interest and thus
> may not require consent of the respective clients."

Mass. R. Prof. C. 1.7 comment 6.  Put differently, "[d]irect
adverseness requires a conflict as to the legal rights and
duties of the clients, not merely conflicting economic
interests."  American Bar Association Standing Committee on
Ethics and Professional Responsibility, Formal Op. 05-434, at
140 (Dec. 8, 2004) (ABA Op. 05-434).

Curtis v. Radio Representatives, Inc., 696 F. Supp. 729
(D.D.C. 1988), a case involving broadcast licenses, offers a

useful example.  In Curtis, the United States District Court for the District of Columbia found that no actionable conflict of interest existed where a law firm simultaneously represented clients in the preparation and prosecution of applications for radio broadcast licenses from the Federal Communications Commission (FCC).  Id. at 731-32, 737.[8]  The court reasoned that "the fact that an attorney is simultaneously representing two companies that are competitors in the same industry does not itself establish an actionable breach of an attorney's fiduciary duty."  Id. at 736, quoting D.J. Horan & G.W. Spellmire, Jr., Attorney Malpractice:  Prevention and Defense 17-1 (1987).  It went on to explain that a conflict of interest could develop between clients seeking broadcast licenses under circumstances where "objectionable electrical interference existed between two stations."  Curtis, supra.  However, because the defendant failed to assert such interference, or even the potential for such interference, the court could not conclude that a conflict of interest existed in violation of the rules of professional conduct adopted by the District of Columbia.  Id. at 736-37.

The analysis undertaken by the court in Curtis is instructive in our evaluation of Maling's claims.  Finnegan's

---

[8] There are very few appellate court decisions that deal with the issues raised in this case.  The most instructive cases are those decided by judges in the Federal District Courts.  See generally Gunn v. Minton, 133 S. Ct. 1059, discussed in note 4, supra.

representation of Maling and Masunaga is analogous to that
undertaken by the law firm in Curtis. Finnegan represented two
clients competing in the screwless eyeglass device market in
proceedings before the USPTO. As Maling acknowledges, Finnegan
was able successfully to obtain patents from the USPTO for both
his device and Masunaga's, in the same way that the law firm in
Curtis was able to obtain radio broadcast licenses for each of
its clients from the FCC. Maling and Masunaga were not
competing for the same patent, but rather different patents for
similar devices.

Like the court in Curtis, we acknowledge that an actionable
conflict of interest could arise under different factual
circumstances. For example, where claims in two patent
applications filed prior to March 16, 2013, are identical or
obvious variants of each other, the USPTO can institute an
"interference proceeding" to determine which inventor would be
awarded the claims contained in the patent applications. 35
U.S.C. § 135(a) (2002).[9,10] If the USPTO had called an

---

[9] Under the America Invents Act, inventorship of patents and
patent applications that do not contain any claims entitled to a
priority date before March 16, 2013, must be challenged through
a derivation, rather than interference, proceeding. See 35
U.S.C. § 135 (2012); United States Patent and Trademark Office,
Manual of Patent Examining Procedure (MPEP) § 2159 (rev. Nov.
2013), available at http://www.uspto.gov/web/offices/pac/mpep/
mpep-2100.pdf [http://perma.cc/8TB2-B5RN]. Derivation
proceedings permit a true inventor to challenge a first-to-file
inventor's right to a patent by demonstrating that claims

interference proceeding to resolve conflicting claims in the Maling and Masunaga patent applications, or if Finnegan, acting as a reasonable patent attorney, believed such a proceeding was likely, the legal rights of the parties would have been in conflict, as only one inventor can prevail in an interference proceeding. In such a case, rule 1.7 would have obliged Finnegan to disclose the conflict and obtain consent from both

---

contained in the first application derived from those in the true inventor's patent application. 35 U.S.C. § 135.

Because the Maling and Masunaga Optical Manufacturing Co., Ltd. (Masunaga), patents were filed prior to the effective date of the relevant provisions of 35 U.S.C. § 135, the applications would have been subject to an interference proceeding had a question arisen as to whether the patent applications contained conflicting claims.

[10] Interference proceedings are meant to assist the director of the USPTO in determining priority, that is, which party first invented the commonly claimed invention. See MPEP, supra at § 2301 (rev. Oct. 2015) at http://www.uspto.gov/web/offices/pac/mpep/mpep-2300.pdf [http://perma.cc/T2D9-G52D]. This first-to-invent system was supplanted by the enactment of the America Invents Act, which updated various provisions of the patent code, and which gives priority to the first party to file an application. See 35 U.S.C. § 135 (2012). Prior to the American Invents Act, 35 U.S.C. § 135(a) (2006) provided, in relevant part:

"Whenever an application is made for a patent which, in the opinion of the Director [of the USPTO], would interfere with any pending application, or with any unexpired patent, an interference may be declared and the Director shall give notice of such declaration to the applicants, or applicant and patentee, as the case may be. The Board of Patent Appeals and Interferences shall determine questions of priority of the inventions and may determine questions of patentability."

clients or withdraw from representation.  See Mass. R. Prof. C.
1.7 comments 3 & 4.

Maling's conclusory allegations as to the high degree of
similarity between his device and the Masunaga device are
contradicted by his acknowledgment elsewhere in the complaint
that patents issued for both his applications and the Masunaga
applications.  Although Maling alleges that the Masunaga and
Maling applications are "similar . . . in many important
respects," he does not allege that the claims are identical or
obvious variants of each other such that the claims in one
application would necessarily preclude claims contained in the
other.  Additionally, we appreciate that the claims comprising a
patent application may be sufficiently distinct so as to permit
the issuance of multiple patents for similar inventions, or
components of an invention, as was the case here.  Accordingly,
Maling's allegations do not permit any inference as to whether
the similarities between the inventions at the time Finnegan was
retained to prepare and prosecute Maling's patent applications
were of such a degree that Finnegan should have reasonably
foreseen the potential for an interference proceeding.[11]
Maling's conclusory statement that the inventions were very

---

[11] Maling's allegation that he and Masunaga competed in the
"same patent space," without more, fails to demonstrate
entitlement to relief.  Maling cites no authority, and we have
found none, that gives this term special meaning in the context
of patent jurisprudence.

similar is precisely the type of legal conclusion that we do not credit. See Iannacchino, 451 Mass. at 636. Moreover, Maling makes no allegations that an interference proceeding was instituted, nor has he alleged facts supporting the inference that Finnegan took positions adverse to Maling and favorable to Masunaga in the prosecution of their respective patents.

We also recognize that subject matter conflicts can give rise to conflicts of interest under rule 1.7 (a) (1) in nonlitigation contexts. Comment 7 to rule 1.7 explains that directly adverse conflicts may also arise in the course of transactional matters. For example, "a lawyer would be precluded . . . from advising a client as to his rights under a contract with another client of the lawyer . . . . Such conflict involves the legal rights and duties of the two clients vis-[à]-vis one another." ABA Op. 05-434, supra at 140.

Here, such a conflict likely arose in 2008 when Maling sought a legal opinion from Finnegan regarding the likelihood that he might be exposed to claims by Masunaga for patent infringement. Finnegan declined to provide the opinion, and Maling alleges that he lost financing as a result. Providing the opinion arguably would have rendered the interests of Maling and Masunaga "directly adverse" within the meaning of rule 1.7 (a) (1), and either declining representation or disclosing the conflict and obtaining consent would have been the proper

course of action.[12]  But there is no allegation that Finnegan had agreed to provide such opinions in its engagement to prosecute Maling's patents.  Without such a claim, we cannot conclude that a conflict based on direct adversity has been adequately alleged.

b.  Material limitation under rule 1.7 (a) (2).  We turn next to the question whether Finnegan's representation of Masunaga "materially limited" its representation of Maling in contravention of rule 1.7 (a) (2), which prohibits representation where "there is no direct adverseness . . . [but] there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests."  Mass. R. Prof. C. 1.7 comment 8.  The "critical inquiry" in analyzing potential conflicts under rule 1.7 (a) (2), "is whether the lawyer has a competing interest or responsibility that 'will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client.'"  Matter of Driscoll, 447 Mass. 678, 686 (2006) (quoting comment 4 to

---

[12] The record does not reflect Finnegan's rationale for declining to provide the opinion.

previous version of Mass. R. Prof. C. 1.7 [b], which contained language now in rule 1.7 [a] [2]).

In his complaint, Maling alleges in conclusory terms that Finnegan was unable to protect both his interests and Masunaga's and ultimately chose to protect Masunaga at his expense in the patent prosecution process. In Maling's view, Finnegan "pulled its punches" and got more for Masunaga than for Maling before the USPTO. He has failed, however, to allege sufficient facts to support such a proposition.

The case of Sentinel Prods. Corp. vs. Platt, U.S. Dist. Ct., No. 98-11143-GAO (D. Mass. July 22, 2002) (Sentinel), illustrates how a subject matter conflict resulting from the prosecution of patents for competing clients could give rise to a conflict of interest under rule 1.7 (a) (2). In the Sentinel case, a law firm prosecuted patents for two clients, a company (Sentinel), and one of Sentinel's former employees. Id. at 1. Sentinel brought suit, claiming that because of the simultaneous representation, its patent applications "were denied, delayed, or otherwise impeded" and that it suffered economic losses as a result. Id. at 5. On a motion for summary judgment, the court concluded that the law firm filed applications with the USPTO for Sentinel, and then two weeks later for the former employee. Id. at 1-2. The firm's attorneys testified that they thought the applications "overlapped" and that they were unable "to

discern a patentable difference between" the applications.  Id.
at 5.  A patent for the employee's application was issued first,
and Sentinel's application was rejected after the USPTO found it
conflicted with claims contained in the employee's patents.  Id.
at 2-3.  The firm subsequently narrowed the claims in Sentinel's
application to avoid conflict with the former employee's
application, and the USPTO issued Sentinel patents containing
the narrower claims.  Id. at 3, 6-7.

The so-called "claim shaving," see Hricik, supra at 415,
that occurred in Sentinel clearly implicates rule 1.7 (a) (2).
Altering the claims in one client's application because of
information contained in a different client's application at
least creates a question of fact as to whether "courses of
action that reasonably should be pursued on behalf of the
client" were foreclosed.  Mass. R. Prof. C. 1.7 comment 8.

Unlike the facts in Sentinel, Maling's complaint provides
little more than speculation that Finnegan's judgment was
impaired or that he obtained a less robust patent than if he had
been represented by other, "conflict-free" counsel.  Maling does
not allege that the claims contained in his applications were
altered or narrowed in light of the Masunaga applications, as
the plaintiffs demonstrated in Sentinel, or, importantly, that
his client confidences were disclosed or used in any way to

Masunaga's advantage.[13]  Nor does he allege that Finnegan delayed

filing his patent application to ensure the success of

Masunaga's application over his own.  Ultimately, Maling's bare

assertions that Masunaga was given preferential treatment and

was "enrich[ed]" to his "detriment" as a consequence do not

support an inference that Finnegan was "materially limited" in

its ability to obtain patents for Maling's inventions.

Finnegan's subsequent inability or unwillingness to provide

a legal opinion regarding the similarities between the Maling

and Masunaga inventions also raises a question whether the

simultaneous representation "foreclose[d] [a] course[] of

action" that should have been pursued on Maling's behalf.  Mass.

R. Prof. C. 1.7 comment 8.  As previously discussed, rendering

such an opinion would likely have created a direct conflict

between Maling and Masunaga in violation of rule 1.7 (a) (1).

To the extent that such a conflict was foreseeable, because, as

Maling alleges, the Masunaga and Maling inventions were so

similar, it is possible that Finnegan should have declined to

represent Maling from the outset of his case so as to also avoid

a violation of rule 1.7 (a) (2).  This, however, depends in

_____

[13] Contrast <u>Tethys Bioscience, Inc</u>. v. <u>Mintz, Levin, Cohn,
Ferris, Glovsky & Popeo, P.C.</u>, No. C09-5115 CW, slip op. at 4,
10 (N.D. Cal. June 4, 2010) (allegations that defendant law
firm's use of "nearly identical" language in patent applications
for plaintiff and plaintiff's competitor were sufficient to
plead actionable conflict of interest because court could draw
inference of the improper disclosure of client information).

large measure on the nature of Finnegan's engagement by Maling in 2003.

Before engaging a client, a lawyer must determine whether the potential for conflict counsels against undertaking representation.  Comment 8 to rule 1.7 elaborates:

> "The mere possibility of subsequent harm does not itself require disclosure and consent.  The critical questions are the likelihood that a difference in interests will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client."

Maling's complaint does not contain any allegations as to the services or scope of representation agreed upon by Maling and Finnegan other than that Finnegan "agreed to file and prosecute a patent for Maling's inventions."  Nor is it adequately alleged that Finnegan should have reasonably anticipated that Maling would need a legal opinion that would create a conflict of interest.  There are simply too few facts from which to infer that Finnegan reasonably should have foreseen the potential conflict in the first place.  See, e.g., Vaxiion Therapeutics, Inc. v. Foley & Lardner LLP, 593 F. Supp. 2d 1153, 1173 (S.D. Cal. 2008) (deciding that expert testimony created question of fact as to likelihood that conflict of interest would develop from firm's simultaneous representation of competitor clients in patent prosecution).  Based on these

inadequacies, we agree with the motion judge that the complaint does not sufficiently allege that Finnegan violated its duties under rule 1.7 (a) (2) by undertaking representation of both Maling and Masunaga.

Because Maling's claims hinge on the existence of a conflict of interest, and because we conclude there was none adequately alleged in this case, he fails to state a claim on each of the counts in his complaint.[14,15]

---

[14] At oral argument, Maling's counsel implied that Finnegan's failure to discover and disclose Masunaga's patents in the course of its prior art searches constituted malpractice or negligence. Because Maling's complaint contains no allegations to this effect, we do not decide the question whether an attorney has an ongoing obligation to discover prior art.

[15] Maling also alleges that Finnegan failed to disclose information to the USPTO such that it engaged in "inequitable conduct." "Inequitable conduct" in the USPTO occurs when a party withholds information material to patentability, or material misinformation is provided to the USPTO, with the intent to deceive or mislead the patent examiner into granting the patent. Outside the Box Innovations, LLC v. Travel Caddy, Inc., 695 F.3d 1285, 1290 (Fed. Cir. 2012)

Even if this claim arises from conduct unrelated to the alleged conflict of interest, Maling nonetheless fails to state a claim. First, it is unsettled whether the "inequitable conduct" doctrine is merely a defense or whether it provides an independent cause of action against counsel. See ShieldMark, Inc. v. Creative Safety Supply, LLC, No. 1:12-CV-221, slip op. at 12-13 (N.D. Ohio Oct. 9, 2012), report and recommendation adopted, No. 1:12-CV-221 (N.D. Ohio Jan. 9, 2013) (describing "the dearth of case law on the issue"). We need not decide the issue, however, as Maling failed to plead sufficient facts to state a claim for inequitable conduct. "To successfully prove inequitable conduct, the accused infringer must provide evidence that the applicant (1) made an affirmative misrepresentation of

c. <u>Identifying conflicts of interest</u>. This case also raises important considerations under Mass. R. Prof. C. 1.10, as appearing in 471 Mass. 1363 (2015), which prohibits lawyers associated in a firm from "knowingly represent[ing] a client when any one of them practicing alone would be prohibited from doing so by Rule[] 1.7." Mass. R. Prof. C. 1.10 (a).[16] To ensure compliance with both rules 1.7 and 1.10, firms must implement procedures to identify and remedy actual and potential conflicts of interest. See Mass. R. Prof. C. 5.1 comment 2, as appearing in 471 Mass. 1445 (2015) (requiring firms to make "reasonable efforts to establish internal policies . . . designed to detect and resolve conflicts of interest").

What constitutes an adequate conflict check is a complex question. As a member of this court observed, "[a]gainst a backdrop of increasing law firm reorganizations and mergers,

---

material fact, failed to disclose material information, or submitted false material information, and (2) did so with intent to deceive the [USPTO]." <u>Cancer Research Tech. Ltd</u>. v. <u>Barr Labs., Inc</u>., 625 F.3d 724, 732 (Fed. Cir. 2010), cert. denied, 132 S. Ct. 499 (2011). Maling, at a minimum makes no allegations as to Finnegan's intent to deceive the USPTO, and therefore fails to state a claim of inequitable conduct.

[16] The lawyers working on Masunaga's patent prosecution worked out of a different office than the lawyers working on the prosecution of Maling's patents. Although the risks of inadvertent confidential client information disclosure or misuse may be reduced in such circumstances, this makes little difference from a disciplinary rules standpoint as conflicts are generally imputed to all members of the firm regardless of their geographical location or work assignments.

lateral transfers, and the rise of large-scale firms that transcend State and national borders, the issue of dual representation is one of multifaceted overtones and novel complexity." Coke v. Equity Residential Props. Trust, 440 Mass. 511, 518 (2003) (Cowin, J., concurring). Nothing we say here today, however, should be construed to absolve law firms from the obligation to implement robust processes that will detect potential conflicts.

This court has not defined a minimum protocol for carrying out a conflict check in the area of patent practice, or any other area of law. However, no matter how complex such a protocol might be, law firms run significant risks, financial and reputational, if they do not avail themselves of a robust conflict system adequate to the nature of their practice. Although Maling's complaint does not plead an actionable violation of rule 1.7 sufficiently, the misuse of client confidences and the preferential treatment of the interests of one client, to the detriment of nearly identical interests of another, are serious matters that cannot be reconciled with the ethical obligations of our profession.

3. Conclusion. As noted throughout this opinion, there are various factual scenarios in the context of patent practice in which a subject matter conflict may give rise to an actionable violation of rule 1.7. On the facts alleged in

Maling's complaint, however, we find that no actionable conflict of interest existed.  The dismissal of the complaint is affirmed.

<u>So ordered</u>.