NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-12003


BRYAN CORPORATION  vs.  BRYAN ABRANO.



Suffolk.     March 8, 2016. - June 14, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, & Hines, JJ.


Attorney at Law, Disqualification, Conflict of interest.



Civil actions commenced in the Superior Court Department on November 7, 2014, and March 13, 2015.

After transfer to the business litigation session and consolidation, a motion to disqualify counsel was heard by Janet L. Sanders, J.

The Supreme Judicial Court granted an application for direct appellate review.


Richard J. Yurko (Douglas W. Salvesen with him) for the defendant.
Euripides D. Dalmanieras (Caroline Stoker Donovan with him) for the plaintiff.


CORDY, J.  The defendant, Bryan Abrano (Bryan), appeals

from a Superior Court judge's order disqualifying his attorneys,

members of the firm of Yurko, Salvesen & Remz, P.C. (YSR), from

representing him in a dispute against the plaintiff, Bryan

Corporation (company), of which Bryan is a shareholder.   The

Superior Court judge granted the plaintiff's motion to

disqualify on the ground that YSR's representation of Bryan

violated Mass. R. Prof. C. 1.7, as appearing in 471 Mass. 1335

(2015), or in the alternative, Mass. R. Prof. C. 1.9, as

appearing in 471 Mass. 1359 (2015), governing the concurrent and

successive representation of clients, respectively.  Because we

conclude that YSR's conduct violated rule 1.7's prohibition

against the simultaneous representation of adverse parties, we

affirm the order of disqualification.[1]

1.  Background.  We summarize the facts relevant to the

posture of this controversy, which arises from a dispute between

family members who are shareholders in a close corporation.[2]  The

company, which is headquartered in Woburn, was incorporated in

1985 as a close corporation and supplies pharmaceuticals and

medical devices.  Since October, 2008, the company has had three

---

[1] Also before us is a motion filed by Bryan Corporation (company) to supplement the appellate record with materials that were not before the motion judge and the defendant's opposition thereto.  We deny the motion, and do not rely on the appended materials in reaching our conclusion.

[2] "A close corporation is typified by a small number of shareholders, no ready market for the corporate stock, and substantial majority shareholder participation in the management, direction, and operations of the corporation." Merriam v. Demoulas Super Mkts., Inc., 464 Mass. 721, 726 n.12 (2013), citing Donahue v. Rodd Electrotype Co. of New England, 367 Mass. 578, 586 (1975).

shareholders:  Bryan; his sister, Bridget Rodrigue (Bridget); and their mother, Kim Abrano (Kim).  Kim holds fifty-one per cent of the company, Bryan holds thirty-three per cent, and Bridget holds sixteen per cent.  Bryan, Bridget, and Kim all obtained their shares from Frank Abrano (Frank), who founded the company, and who is Kim's estranged husband and Bryan and Bridget's father.  Bryan and Bridget were directors of the company until July, 2014.[3]  Bryan was the company's president and chief executive officer until 2013, when he was replaced by Libor Krupica.  Bridget was the company's secretary and her husband, Dennon Rodrigue (Dennon), was the treasurer.  Kim has been a director since 2008, and in July, 2014, she became the secretary and treasurer, replacing Bridget and Dennon.  Frank is not a stockholder, director, or officer.[4]

a.  The Waldman action.  In October, 2013, Waldman Biomedical Consultancy, Inc., a former consultant to the company, sued the company for over $300,000 in alleged unpaid

---

[3] Prior to becoming shareholders and directors, Bryan Abrano (Bryan) and Bridget Rodrigue (Bridget) were employees of the company.

[4] In 2008, Frank Abrano (Frank) was convicted in Federal court of intentionally causing the company to sell misbranded and adulterated drugs.  He was sentenced to one year and one day in prison and required to pay a $1 million fine.  As part of a related plea agreement and civil settlement with the company, Frank was required to cut all ties with the company and divest himself of his entire interest in the company.  He transferred a controlling interest to his wife, Kim Abrano (Kim), and sold the remaining shares to Bryan and Bridget.

fees (Waldman action). In March, 2014, the company retained YSR to defend it in the Waldman action. YSR and the company executed an engagement letter that provided that YSR would handle discovery and other pretrial matters, and in the event of a trial, a YSR partner (Richard Yurko or Douglas Salvesen) and associate (Anthony Fioravanti) would try the case. The letter did not address conflicts of interest or provide that YSR could withdraw from the representation were a conflict to arise.

YSR filed an answer on the company's behalf in April, 2014. According to YSR's bills for work in the Waldman action, from April 1 through July, 31, 2014, YSR drafted and responded to discovery requests, reviewed documents, consulted with Dennon and Bryan, and discussed various discovery matters with Waldman's counsel.

b. Dispute over compensation. In late June, 2014, a dispute arose over the payment of the company's fiscal-year-end profits, with Bryan and Bridget calling for their shares of the profits to be disbursed in deductible W-2 compensation to avoid double taxation given the company's C Corporation status. Bryan has alleged that Kim, the majority shareholder and "an agent having the management of [the company]," stopped payment on the 2014 year-end profit distribution checks in violation of the Massachusetts Wage Act, G. L. c. 149, § 148 (Wage Act). Kim has alleged that she was unaware of the extent of Bryan and

Bridget's compensation, and that such compensation was unauthorized by the company.

On June 30, 2014, Bridget's husband, Dennon, contacted YSR to "discuss a different matter" from the Waldman action. The following day, Dennon had a conference telephone call with YSR attorneys Yurko and Fioravanti, as well as Bruce Garr, another lawyer for the company who is not associated with YSR. Bryan and Bridget were not on the call, but YSR has acknowledged that an attorney-client relationship was formed with Bryan, Bridget, and Dennon on July 1, 2014.[5] July 1, 2014, was also the day that Bryan and Bridget began requesting that the company issue their "year-end wage checks" to them. During the call, Yurko advised Dennon that should YSR undertake representation of one or more of Bryan, Bridget, and Dennon, a conflict of interest might arise between the company and Bryan or Bridget should they be removed from the board of directors. Yurko indicated to Dennon that, should such a conflict arise, he would withdraw from the Waldman action.

On July, 15, 2014, Kim, Bryan, and Bridget attended a shareholders meeting to elect directors. Bryan and Bridget, who at this point were represented by YSR, did not renominate themselves to the board, instead nominating three other people.

---

[5] Bridget and Dennon Rodrigue (Dennon) are currently represented by counsel from another law firm.

Kim nominated herself and two outside director candidates, all of whom were elected to the three-member board.

On July 21, 2014, YSR sent a demand letter to the company's president and Kim. In the letter, Yurko indicated that he was sending the letter on behalf of Bryan and Bridget in connection with the alleged Wage Act violations and other claims. The letter also stated that Bryan and Bridget each had claims against the company and against Kim and Frank and others.[6] YSR demanded that the company "promptly address and correct these matters."

On July 23, 2014, Yurko sent a letter to Dennon in which YSR resigned as the company's counsel in the Waldman action. The letter stated, "As I mentioned to you late last week, a conflict has developed in our continued representation of [the company] in this matter and therefore, reluctantly, we must resign from the representation." The letter further stated that there was one discovery matter that needed to be finished up, which YSR would do "with your permission." An entry from July 23, 2014, on one of YSR's bills for work on the Waldman action states: "Draft and send letter resigning from case." YSR's bills do not contain any other entries indicating that it

---

[6] The claims related to Frank's alleged participation in company activities in violation of his plea agreement with the Federal government and Kim's alleged enabling of such participation.

discussed resigning with anyone from the company at any other time.  On July 31, 2014, YSR withdrew as counsel from the Waldman action.

c. <u>The parties countersue</u>.  In November, 2014, Bryan, represented by YSR, and Bridget, represented by a different law firm, commenced an action against Frank and Kim, alleging claims under the Wage Act and for breach of contract and breach of fiduciary duty against Kim, and a claim for breach of the covenant of good faith and fair dealing against Frank.[7]  Bryan and Bridget sought treble the amount of their "end of year compensation payments dated June 30," which they said were based on the company's "operating profit for the fiscal year ending June 20, 2014."

The company was not named as a party in the action, but the complaint referred to the company as "[d]efendant Bryan Corporation" four times in the complaint.  Bryan and Bridget also alleged that the company was obligated to pay the wages that formed the basis of their claims:  "Bryan Abrano and Bridget Rodrigue earned substantial wages from their employment by the [c]ompany, which wages were definitely determined and had become due and payable not later than June 30, 2014," and "[t]he

---

[7] The Superior Court dismissed the breach of contract claim against Kim in March, 2015.

[c]ompany had a legal obligation to pay these wages no later than July 7, 2014."[8]

In March, 2015, the company commenced an action against Bryan, Bridget, and Dennon for breach of fiduciary duty (company action). In its complaint, the company disputed that the year-end profit distributions that Bryan and Bridget had previously received during the years 2008 to 2013 were wages, and sought to recover what it alleged were excess distributions paid to them during that period.

In April, 2015, Bryan moved to consolidate the two lawsuits, arguing that the claims asserted by the company against him and Bridget were "the mirror image" of the claims asserted by Bryan and Bridget against Kim and Frank. Both parties appear to agree that the lawsuits turn on whether the payments Bryan and Bridget received from 2008 through 2013 and the 2014 payouts they are seeking represent wages or dividends. The motion was allowed, over the company's objection, in May, 2015.

At the same time, the company moved to disqualify YSR as Bryan's counsel because YSR had represented the company in the Waldman action eight months earlier, between March and July,

---

[8] Because the company was not named as a party to Bryan and Bridget's suit, the company did not have standing to challenge the representation of Bryan by Yurko, Salvesen & Remz, P.C. (YSR).

2014. The company argued that YSR's simultaneous representation of both the company and Bryan constituted an impermissible conflict of interest, and that disqualification was required by rule 1.7, which governs concurrent conflicts of interest, or, in the alternative, rule 1.9, which governs a lawyer's duties to former clients. A hearing was held in August, 2015, and the motion judge allowed the motion "[f]or the reasons set forth . . . in the motion itself." Bryan timely appealed, and we granted his application for direct appellate review.

2. <u>Standard of review</u>. We review an order disqualifying counsel for abuse of discretion. <u>Smaland Beach Ass'n</u> v. <u>Genova</u>, 461 Mass. 214, 220 (2012). Our consideration of the motion is informed by the principle that courts "should not lightly interrupt the relationship between a lawyer and her client." <u>Adoption of Erica</u>, 426 Mass. 55, 58 (1997). "[A]s a prophylactic device for protecting the attorney-client relationship, . . . courts should hesitate to impose [disqualification] except when absolutely necessary" (citation omitted). <u>Id.</u>, quoting <u>Freeman</u> v. <u>Chicago Musical Instrument Co.</u>, 689 F.2d 715, 721 (7th Cir. 1982). Nonetheless, the right to representation by an attorney of one's choosing is not absolute, and must, in some circumstances, yield to other considerations. <u>McCourt Co.</u> v. <u>FPC Props., Inc.</u>, 386 Mass. 145, 151 (1982).

Because the motion judge did not make oral or written findings, our task on appeal is made more difficult, as the factual underpinnings of the judge's decision are unclear, and both parties refer in their briefs to facts that cannot be independently verified. Because the parties do not contest the authenticity of the documents included in the record appendix, our analysis depends largely on the facts as drawn from these documents.

To the extent that the judge adopted wholesale the company's reasons for disqualification, we are free to affirm her ruling on any grounds supported by the record. See Commonwealth v. Va Meng Joe, 425 Mass. 99, 102 (1997).

3. Discussion. The company asks us to affirm the disqualification order on the ground that YSR violated rule 1.7 when it undertook concurrent representation of both the company and Bryan where the parties had a conflict of interest that existed or was foreseeable at the inception of the dual representation. It also asks the court to adopt the so-called "hot potato" doctrine, which "limit[s] the ability of a law firm to terminate its relationship with an existing client 'like a hot potato' so that it may accept a representation of another client in an adverse, but more lucrative, matter." National Med. Care, Inc. vs. Home Med. of Am., Inc., Mass. Super. Ct. No. 0081CV01225, slip op. at note 5 (Middlesex County Sept. 12,

2002). In the alternative, the company argues that rule 1.9's prohibition on using a former client's confidences in subsequent litigation involving that client warrants disqualification.

Bryan counters that rule 1.7 does not govern the issues before us because his interests were not adverse to those of the company at the time the dual representation commenced. He also asks the court to eschew the "hot potato" doctrine as an unnecessary addition to the existing rules of professional conduct and that adopting the doctrine would amount to impermissible ad hoc rulemaking. He also argues that rule 1.9 does not apply in this matter because the record does not support a conclusion that YSR used confidential information relating to its representation of the company to the company's disadvantage in the suit against the company. See Mass. R. Prof. C. 1.9 (c). Lastly, he asserts that even if YSR committed ethical violations, disqualification is not the appropriate remedy in this matter.

Based on our review of the record, we conclude that YSR, acting as a reasonable lawyer, should have known at the time it agreed to represent Bryan, Bridget, and Dennon that their interests were adverse to, or were likely soon to become adverse to, those of the company, and, in these circumstances, both the duty of loyalty and rule 1.7 required it to decline representation, or at least seek the informed consent of the

company.  See Mass. R. Prof. C. 1.7 comment 6.  It was therefore also improper for YSR to send a demand letter to the company while it was still representing the company in the Waldman action and had not obtained its informed consent to do so. Accordingly, the issues in this case are properly analyzed under rule 1.7, and based on the particular facts in this case, we conclude that disqualification is an appropriate remedy. Because the rules and our prior case law provide an adequate framework for resolving the issues in this case, we need not reach the parties' arguments concerning the "hot potato" doctrine, nor do we consider the parties' arguments related to rule 1.9.  Accordingly, we affirm the ruling of the Superior Court judge.

a.  The lawyer's duty of loyalty.  We begin our discussion by reviewing the contours of the duty of loyalty and rule 1.7, particularly as they apply to organizational clients.[9]  With limited exceptions, rule 1.7 prohibits a lawyer from representing a client if the representation is "directly adverse to another client," Mass. R. Prof. C. 1.7 (a) (1), or where

---

[9] The company moved to disqualify YSR under the prior version of rule 1.7.  Rule 1.7 was amended effective July 1, 2015. "Because the substance of rule 1.7 remains unchanged, we analyze [the issues] against the most recent version of the rules, published in 2015.  See Mass. R. Prof. C. 1.7, as appearing in 471 Mass. 1335 (2015)."  Maling v. Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, 473 Mass. 336, 339 n.6 (2015).

"there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." Mass. R. Prof. C. 1.7 (a) (2).

We have previously explained the rule's dual purpose as "a prophylactic [measure] to protect confidences that a client may have shared with his or her attorney . . . [and] safeguard[s] loyalty as a feature of the lawyer-client relationship" (citation omitted). Maling v. Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, 473 Mass. 336, 340 (2015), quoting SWS Fin. Fund A v. Salomon Bros. Inc., 790 F. Supp. 1392, 1401 (N.D. Ill. 1992). In this case, we are particularly concerned with rule 1.7's function in furthering the lawyer's duty of loyalty, which forms the bedrock of the attorney-client relationship. See, e.g., Strickland v. Washington, 466 U.S. 668, 692 (1984) (duty of loyalty is "perhaps the most basic of counsel's duties"); Mass. R. Prof. C. 1.7 comment 1 ("Loyalty and independent judgment are essential elements in the lawyer's relationship to a client"). By prohibiting the simultaneous representation of clients with adverse interests absent informed consent, rule 1.7 fosters a sense of trust between the lawyer and client that promotes the lawyer's ability to competently represent the client's interests. See Mass. R. Prof. C. 1.7

comment 6 ("client as to whom the representation is directly adverse is likely to feel betrayed, and the resulting damage to the client-lawyer relationship is likely to impair the lawyer's ability to represent the client effectively").

Representation is "directly adverse" within the meaning of rule 1.7 (a) (1) when a lawyer "act[s] as an advocate in one matter against a person the lawyer represents in some other matter, even when the matters are wholly unrelated."  Mass. R. Prof. C. 1.7 comment 6.  Thus, "[t]he undivided loyalty that a lawyer owes to his clients forbids him, without the clients' consent, from acting for client A in one action and at the same time against client A in another."  McCourt Co., 386 Mass. at 146.  See Mass. R. Prof. C. 1.7 comment 6 ("Loyalty to a current client prohibits undertaking representation directly adverse to that client without that client's informed consent").

This principle operates with equal force where client A is a corporation, and it is "irrelevant [to our analysis] that the lawsuits are unrelated in subject matter and that it appears probable that client A will not in fact be prejudiced by the concurrent participation of the law firm in both actions." McCourt Co., supra.  Indeed, the rules are clear that where a lawyer represents an organizational client his or her loyalty is owed to the organization, and not the constituents through whom the organization acts.  Mass R. Prof. C. 1.13 (f), as appearing

in 450 Mass. 1301 (2008) ("In dealing with an organization's directors, . . . shareholders, or other constituents, a lawyer shall explain the identity of the client when the lawyer knows or reasonably should know that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing"); Mass. R. Prof. C. 1.13 comment 1 ("An organizational client is a legal entity, but it cannot act except through its officers, directors, employees, shareholders and other constituents").

b. <u>Applicability of rule 1.7</u>. Bryan contends that rule 1.7 does not govern our analysis in this case because there was no conflict of interest prior to July 15, 2014. Bryan maintains that the matter in which he and the others sought advice from YSR in early July, 2014, was related to Frank's alleged impermissible involvement in company affairs, such as Frank's interference with the normal payroll process, including the withholding of the checks. Thus, he argues, when YSR agreed to represent Bryan, Bridget, and Dennon on July 1, 2014, there was no adversity between them and the company, and the rules therefore permitted the firm to represent both the company and its constituents. See Mass. R. Prof. C. 1.13 (g) ("A lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders, or other constituents, subject to the provisions of Rule 1.7"). From

Bryan's perspective, the conflict did not emerge until after July 15, 2015, when he and Bridget were not reelected to the board of directors, at which point rule 1.7 was triggered and YSR was required to resolve the conflict by terminating its relationship with one of the clients.

We disagree with this view, as Bryan's arguments depend on an overly narrow reading of rule 1.7.  In Maling, we explained that rule 1.7 encompasses a lawyer's duty to anticipate potential conflicts and, where appropriate, decline representation.  Maling, 473 Mass. at 347 ("Before engaging a client, a lawyer must determine whether the potential for conflict counsels against undertaking representation.")  Rule 1.13 incorporates a similar duty with respect to an organization and its constituents, stating:

> "There are times when the organization's interest may be or become adverse to those of one or more of its constituents.  In such circumstances the lawyer should advise any constituent, whose interest the lawyer finds adverse to that of the organization of the conflict or potential conflict of interest, that the lawyer cannot represent such constituent, and that such person may wish to obtain independent representation" (emphasis added).

Mass R. Prof. C. 1.13 comment 10.  We accordingly focus our inquiry on whether, in light of the facts, YSR, acting as a reasonable lawyer, was obliged to identify the adverse interests between Bryan, Bridget, and Dennon, on the one hand, and YSR's client, the company, on the other, and decline representation.

Bryan argues that nothing in the record supports the company's assertion that he and Bridget consulted with YSR about filing an action against the company with respect to the withheld checks as of July 1, 2014. Ultimately, however, whether it was on July 1 or July 15, 2014, that YSR agreed to represent Bryan and the others regarding claims against the company related to Wage Act violations is not essential to our decision.

Direct adversity involves a conflict between the legal rights and duties of clients. Maling, 473 Mass. at 341-342, quoting American Bar Association Standing Committee on Ethics and Professional Responsibility, Formal Op. 05-434, at 140 (Dec. 8, 2004). In Maling, we explained that where a lawyer represents two clients, and where circumstances arise such that a reasonable lawyer would believe that the actions required to provide competent representation of one client would render the client's interests adverse to those of another client of the lawyer, the proper course of action is to disclose the conflict and obtain the informed consent of both clients, or withdraw from representation. Id. at 343; Mass. R. Prof. C. 1.7 comments 3, 4.[10] See Coke v. Equity Residential Props. Trust, 440 Mass.

---

[10] Rule 1.13 (g) of the Massachusetts Rules of Professional Conduct, as appearing in 450 Mass. 1301 (2008), adds that, "[i]f the organization's consent to the dual representation is required by Rule 1.7, the consent shall be given by an

511, 517 (2003) ("[P]utting it as mildly as we can, we think it would be questionable conduct for an attorney to participate in any lawsuit against his own client without the knowledge and consent of all concerned" [citation omitted]). Similarly, we conclude that where such circumstances exist prior to the inception of the lawyer-client relationship, best practice requires the lawyer to decline representation or disclose the conflict to both clients. See Mass. R. Prof. C. 1.16 (a) (1), as appearing in 471 Mass. 1305 (2015) ("a lawyer shall not represent a client . . . if . . . the representation will result in violation of the rules of professional conduct or other law").

According to Bryan and Bridget's own allegations, they had begun requesting the checks allegedly withheld by Kim as of July 1, 2015, and they claimed that the company had a legal obligation to pay these wages. Such claims fit squarely into our definition of direct adversity. Thus, even accepting Bryan's contention that Dennon did not specifically mention the withheld checks as of July 1, 2014, YSR should have taken reasonable measures to ascertain the potential conflict. See Maling, 473 Mass. at 348; Mass. R. Prof. C. 1.7 comment 3 ("A

---

appropriate official of the organization other than the individual who is to be represented, or by the shareholders." Thus, Bryan, Bridget, and Dennon were not in a position to consent.

conflict of interest may exist before representation is undertaken, in which event the representation must be declined, unless the lawyer obtains the informed consent of each client . . . . To determine whether a conflict of interest exists, a lawyer should adopt reasonable procedures, appropriate for the size and type of firm and practice, to determine in both litigation and non-litigation matters the persons and issues involved").

Additionally, it is apparent from the record that YSR was well aware of the potential for a conflict, as it advised Dennon on July 1, 2014, that changes in the board's structure could result in an actual conflict of interest that would require it to withdraw from representing both them and the company. Again, it was reasonably foreseeable that Bryan and Bridget would be replaced as directors, and the minutes of that board meeting reflect that neither renominated themselves to remain on the board, creating a strong probability that they knew the board's structure would change. Thus, the circumstances in this case were not the type of "[u]nforeseeable development[] . . . [that] might create conflicts in the midst of a representation." Mass. R. Prof. C. 1.7 comment 5.

In light of these considerations, we find that a reasonable attorney would have or should have known that a conflict of interest existed or was so likely to materialize such that a

prudent attorney would have declined representation or disclosed the conflict to an appropriate company representative who could consent to the dual representation.[11]  Accordingly, YSR's decision as of July 1, 2014, to represent Bryan, Bridget, and Dennon constituted a violation of both its duty of loyalty to the company and rule 1.7's prohibition against the simultaneous representation of clients whose interests are adverse.

c.  <u>Other considerations</u>.  A few final observations are in order.  The manner in which YSR terminated its relationship with the company was largely improper.  The record indicates that YSR only communicated with Dennon regarding its plans to withdraw from the Waldman action; however, the rules make plain that Dennon could not consent either to the withdrawal or to YSR's wrapping up of certain tasks in the Waldman action after YSR sent the letter.  Mass. R. Prof. C. 1.13 comment 10.  It also follows that YSR acted in contravention of rule 1.7 by simultaneously representing Bryan and the others after July 15, 2014, without obtaining the company's informed consent.

Further, it was improper for YSR to withdraw prior to the completion of the Waldman action, and the development of the conflict does not justify the firm's actions.  In <u>Maling</u>, 473

---

[11] Again, because Dennon's interests were adverse to those of the company, he was not in a position to consent to the dual representation.  See Mass. R. Prof. C. 1.13 (g).  YSR might have, for example, contacted Libor Krupica, the company's then president, to disclose the conflict and seek consent.

Mass. at 344-345, we recognized that a lawyer's duty to detect and prevent potential conflicts may be circumscribed by the scope of engagement undertaken by a lawyer. See Mass. R. Prof. C. 1.2 (c), as appearing in 471 Mass. 1313 (2015). Here, however, it appears from the engagement letter with the company that YSR did nothing to limit its representation in a manner that might have permitted YSR to represent adverse clients on matters unrelated to its work in the Waldman action, or that might have permitted YSR to withdraw from representation prior to the completion of the action if a conflict arose. See Mass. R. Prof. C. 1.16 comment 1 ("A lawyer should not accept representation in a matter unless it can be performed competently, promptly, without improper conflict of interest and to completion"); Mass. R. Prof. C. 1.3 comment 4, as appearing in 471 Mass. 1318 (2015) ("Unless the relationship is terminated as provided in Rule 1.16, a lawyer should carry through to conclusion all matters undertaken for a client").

Thus, by undertaking representation of the company in the manner contemplated by the engagement letter, YSR owed it the full panoply of duties that attend the lawyer-client relationship, chief among which is a duty of undivided loyalty. We therefore conclude that a firm may not undertake representation of a new client where the firm can reasonably anticipate that a conflict will develop with an existing client,

and then choose between the two clients when the conflict materializes. Both the duty of loyalty and the rules clearly forbid such conduct.

d. Remedy of disqualification. Bryan argues that the Superior Court judge did not have the authority to disqualify YSR as a means of remedying its ethical violations. He contends that disqualification is only necessary to protect the confidences of a former client or the integrity of a pending action. We disagree. We have previously explained that disqualification is appropriate in concurrent representation scenarios even where the client seeking disqualification "will not in fact be prejudiced by the concurrent participation of the law firm in both actions." McCourt Co., 386 Mass. at 146. Additionally, although we have held that the appearance of impropriety alone is not sufficient grounds for disqualifying an attorney, we left open the possibility that, where ethical violations occurred, disqualification may be appropriate. See Adoption of Erica, 426 Mass. at 64.

Here, where YSR's conduct constituted a violation of both its duty of loyalty to the company as well as rule 1.7, we conclude that it was not an abuse of discretion for the judge to order disqualification as an appropriate remedy. In this case, disqualification furthers the policy rationale underlying the rules of professional conduct by upholding the principle that a

client is entitled to the undivided loyalty of his or her lawyer.

4.  Conclusion.  For these reasons, we affirm the ruling by the Superior Court judge granting the motion for disqualification.

So ordered.