SUPERIOR COURT 
 
 IMPACT TECHNOLOGY LICENSING , LLC, AND BOSTON TECHNOLOGY CONSULTANTS GROUP, INC. (D/B/A IMPACT TECHNOLOGY DEVELOPMENT) v. BARRY-WEHMILLER COMPANIES, INC.; CARR BIOSYSTEMS, LLC; PNEUMATIC SCALE CORP.(D/B/A “PNEUMATIC SCALE ANGELUS CORP.”); \

 
 Docket:
 @2484CV03350-BLS2
 
 
 Dates:
 March 7, 2025
 
 
 Present:
 Kenneth W. Salinger Justice of the Superior Court
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 DECISION AND ORDER ON DEFENDANTS’ PARTIAL MOTION TO DISMISS
 
 

 
This case concerns a Technology Transfer Agreement (the “Agreement”) that Boston Technology Consultants Group, Inc., (“BTCG”) entered into with an entity described in the contract as “PneumaticScaleAngleus Corp.,” which was actually a trade name of Pneumatic Scale Corp. The Defendants represent that Pneumatic Scale Angelus, LLC ( “PSA”) “is the only PSA entity that still exists,” implying that PSA is the legal successor to Pneumatic Scale Corp.’s rights and obligations under the Agreement. The amended complaint alleges that Barry- Wehmiller Companies, Inc., has owned both PSA and CARR Biosystems, LLC (“Carr”) since 2004, and that in 2022 or 2023 it transferred to Carr the administration and operation of the centrifuge business that PSA had been running based on technology transferred to it under the Agreement.
Defendants have moved under Mass. R. Civ. P. 12(b)(6) to dismiss Plaintiffs’ claims that: PSA breached the Agreement; PSA also breached a subsequent contract covering the same subject matter that was purportedly established by promissory estoppel; all defendants are liable on a theory of unjust enrichment; Barry-Wehmiller and Carr intentionally interfered with a contract provision barring PSA from assigning its rights or obligations under the Agreement without BTCG’s consent; PSA purportedly agreed to entire into a joint venture to carry out the purposes of the Agreement, and breach the fiduciary duties that it owed as a joint venturer; Barry-Wehmiller and Carr aided and abetted PSA’s alleged breach of fiduciary duty; all defendants engaged in unfair or deceptive conduct in violation of G.L. c. 93A; and Plaintiffs are entitled to an accounting. Defendants have not moved to dismiss Plaintiffs’ claims for
 
                                                            -1-
 
declaratory relief, for breach of the implied covenant of good faith and fair dealing that is part of the Agreement, to enforce a contractual right to inspect books and records, or on a theory of equitable estoppel.
The Court could dismiss the entire action because Plaintiffs violated the requirement that they provide only a “short and plain statement” of their claims. But it will instead address the merits of the claims that Defendants have challenged in their partial motion to dismiss, as well as Impact Technology Licensing, LLC’s lack of standing to enforce the Agreement.
The Court will deny in part Defendants’ motion to dismiss with respect to:
(I) so much of count I of the amended complaint in which BTCG asserts that PSA breached the Agreement by stopping royalty payments in February 2024 even though there had been no “expiration” of any covered patent; (ii) the claim by BTCG in count V that PSA also breached the Agreement by failing to maintain a particular Russian patent; (iii) so much of count II asserting that PSA (but not the other Defendants) violated G.L. c. 93A on a “stringing along” theory; and (iv) so much of count VIII asserting that PSA (but not the other Defendants) violated c. 93A by making alleged misrepresentations.
The Court will allow in part the motion to dismiss with respect to the other aspects of counts I, II, V, and VIII, and with respect to counts III, IV, VI, VII, IX, X, and XIV in their entirety. In so doing, the Court is dismissing all claims against Barry-Wehmiller and Carr except for the claim in count XI seeking a declaratory judgment as to whether a “Triggering Event” has occurred within the meaning of the Agreement; Defendants did not move to dismiss that claim.
The Court will dismiss without prejudice the claims by Impact Technology Licensing for breach of contract in counts I, V, and XII for lack of standing, on its own motion. “Dismissals for lack of subject matter jurisdiction are ordinarily without prejudice because dismissal for lack of jurisdiction is typically not an adjudication on the merits.” Abate v. Fremont Inv. & Loan, 470 Mass. 821, 836 (2015); accord Bevilacqua v. Roberts, 460 Mass. 762, 779–780 (2011).
The Court will also dismiss without prejudice all claims against “PneumaticScaleAngleus Corp.” because that is merely a trade name used by Pneumatic Scale Corp., which is already named as a defendant.
The Court will order that all other claims that it is dismissing in this decision shall be dismissed with prejudice when final judgment enters. A dismissal under Rule 12(b)(6) “for failure to state a claim … operates as a dismissal on
 
                                                            -2-
 
the merits” and therefore has “res judicata effect.” Saade v. Wilmington Trust, National Ass’n, 494 Mass. 1193, 1194 (2024), quoting Mestek, Inc. v. United Pacific Ins. Co., 40 Mass. App. Ct. 729, 731, rev. denied, 423 Mass. 1108 (1996). In other words, a Rule 12(b)(6) dismissal is with prejudice.
1. Failure to Provide a “Short and Plain Statement” of Claims. The Court could dismiss the entire action without prejudice because of Plaintiffs’ egregious violation of the requirement that a complaint contain only “a short and plain statement of the claim.” See Mass. R. Civ. P. 8(a)(1).
Plaintiffs’ prolix pleading is 76 pages long, includes 306 separately numbered and often repetitive paragraphs, and asserts 15 separate counts or causes of action, each of which incorporates by reference all of the preceding paragraphs, and one of which is based on four distinct legal theories. As a result, it is hard to figure out the alleged factual basis for each claim.
Dismissal for failure to comply with the “short and plain statement” requirement of Rule 8(a)(1) is therefore appropriate. See Schaer v. Brandeis Univ., 432 Mass. 474, 477 (2000) (“the judge could have dismissed” complaint because it consisted of 34 pages with 125 numbered paragraphs, and each of seven counts incorporated first 108 paragraphs); Driscoll v. Board of Trustees of Milton Academy, 70 Mass. App. Ct. 285, 299 (2007) (affirming dismissal because complaint consisted of 33 pages with 126 numbered paragraphs, and each count incorporated to all prior paragraphs).
Defendants have not asked the Court to dismiss the action on this basis, however. As a result, and in the exercise of its discretion, the Court will instead address the substance of Defendants’ motion to dismiss.
2. Breach of Contract Claims. Counts I, V, and XII of the amended complaint assert that PSA breached its Technology Transfer Agreement with BTCG in many different ways. Defendants attached a copy of this Agreement to their memorandum.[1] The Court may consider the contract document in deciding this motion to dismiss because Plaintiffs refer to the Agreement in, and relied upon it in framing, their amended complaint. See Lanier v. President and Fellows of Harvard College, 490 Mass. 37, 44 (2022) (documents referenced in complaint); Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 45 n.4 (2004) (document
 
--------------------------------------------
 
[1]  The Technology Transfer Agreement between BTCG and PSA is Section 4 of  the “Unifuge Product Development Plan Phase 2” entered into by those parties. Defendants provided that entire document.
 
                                                            -3-
 
relied upon in framing complaint). The Agreement provides in § 4.15 that it is governed by Massachusetts law.
BTCG’s contract claims mainly concern PSA having taken the position that the Agreement lapsed by its terms on February 25, 2024, and not paying any royalties since then. PSA relies on § 4.8 of the Agreement, which provides that the contract shall continue in effect until the later of (1) 15 years from the date the Agreement was first executed (which was February 25, 2009), or (ii) “the expiration of any patents” related to the technology field covered by the Agreement. PSA argues that, since a Russian patent related to the field expired in April 2014, the Agreement automatically terminated 15 years from the date of execution, in other words on February 25, 2024.
In count I, Plaintiffs claim (under three different theories) that PSA’s failure to pay royalties since that date is a breach of contract because the Agreement remains in force. In count V, Plaintiffs claim that PSA breached the Agreement by not paying a fee needed to keep the Russian patent in effect. Plaintiffs also claim in count I that PSA breached the Agreement by assigning its rights and obligations under that contract without Plaintiffs’ assent. Finally, Plaintiffs claim in count XII that PSA breached the Agreement’s implied covenant of good faith and fair dealing; Defendants have not moved to dismiss count XII.
Though Defendants did not raise the issue, the Court concludes that Impact Technology Licensing, LLC, lacks standing to enforce the Agreement.
Turning to the merits of the breach of contract claims, BTCG’s theory that “any patents” means “all patents” in the contract termination provision fails as a matter of law. In addition, the facts alleged in the amended complaint do not plausibly suggest that the parties later modified the Agreement to change “any patents” to “all patents” or otherwise agreed to keep the contract in force until all covered patents have expired. The Court will therefore allow the motion to dismiss with respect to these aspects of count I. To survive a motion to dismiss under Rule 12(b)(6), a complaint must make factual allegations that, if true, would “plausibly suggest … an entitlement to relief.” Lopez v. Commonwealth, 463 Mass. 696, 701 (2012), quoting Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), and Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007).
The Court will deny the motion to dismiss with respect to BTCG’s claim in count V that PSA breached the Agreement by failing to pay a fee needed to keep the Russian patent in effect, and with respect to so much of count I in which BTCG asserts that the Agreement remains in effect because the lapse of
 
                                                            -4-
 
a Russian patent does not constitute the “expiration” of a patent within the meaning of the termination provision. These claims by BTCG are based on plausible readings of ambiguous contract provisions.
Finally, the Court will allow the motion to dismiss with respect to the claim in count I that PSA breached the Agreement by assigning its contractual rights and obligations without BTCG’s consent, because the facts alleged do not plausibly suggest that PSA made any such an assignment. Transfer of administrative and operational responsibilities is not an assignment of contract rights or obligations.
2.1. Impact Technology Licensing, LLC, Lacks Standing. The amended complaint improperly conflates BTCG, a Massachusetts corporation that now does business using the name “Impact Technology Development,”[2] with a separate Massachusetts limited liability company called Impact Technology Licensing, LLC. The complaint lumps these two businesses together, refers to them collectively as “IMPACT,” and asserts every claim jointly on behalf of both plaintiffs, without alleging facts to explain why each plaintiff has standing to assert each claim. That is improper, at least with respect to the claims that PSA breached the Agreement that it entered into with BTCG.
The Agreement and amended complaint make clear that Impact Technology Licensing lacks standing to sue for an alleged breach of the Agreement because it is not a party to that contract, it is not an intended third-party beneficiary of the Agreement, and Plaintiffs do not allege that it is a legal successor to or assignee of any rights granted to BTCG under the Agreement.
Standing is a question of subject matter jurisdiction. Indeck Maine Energy, LLC v. Commissioner of Energy Resources, 454 Mass. 511, 516 (2009). The question of whether a plaintiff has standing, like all questions of subject matter jurisdiction, “goes to the power of the court to hear and decide the matter.” Ginther v. Commissioner of Ins., 427 Mass. 319, 322 n.6 (1998). Since standing is “a component of subject matter jurisdiction,” a judge may consider and decide whether a party has standing to assert a claim “sua sponte … at any time.” Abate v. Fremont Inv. & Loan, 470 Mass. 821, 828 (2015), citing Mass. R. Civ. P. 12(h)(3) (court “shall dismiss” action “whenever it appears … that the court lacks jurisdiction of the subject matter”)
 
--------------------------------------------
 
[2]        The signature block of the Agreement states that as of 2009 BTCG was doing business as “Impact Technology Consultants.”
 
                                                            -5-
 
The Court must address the issue even though Defendants did not raise it. “[W]henever a problem of subject matter jurisdiction becomes apparent to a court, the court has ‘both the power and the obligation’ to resolve it, ‘regardless [of] whether the issue is raised by the parties.’ ” Rental Prop. Mgmt. Servs. v. Hatcher, 479 Mass. 542, 547 (2018) (bracketed material in original), quoting HSBC Bank U.S.A., N.A. v. Matt, 464 Mass. 193, 199 (2013). “Subject matter jurisdiction cannot be conferred by consent, conduct or waiver.” Rental Prop. Mgmt., supra, quoting Litton Business Sys., Inc.  v.  Commissioner  of Revenue, 383 Mass. 619, 622 (1981).
As a general matter, a person or entity that is not a party to a contract has no standing to enforce the contract. See Sullivan v. Kondaur Capital Corp., 85 Mass. App. 202, 205 (2014). Since Impact Technology Licensing is not a party to the Agreement, and the facts alleged in the amended complaint do not suggest that this LLC has a right to enforce the Agreement on any other basis, its claims for breach of that contract must be dismissed for lack of standing. See, e.g., Kessler v. Cambridge Health Alliance, 62 Mass. App. Ct. 589, 593 (2004) (affirming dismissal).
While there is an exception for intended third-party beneficiaries, “a contract does not confer [such] status unless the ‘language and circumstances of the contract’ show that the parties to the contract ‘clear[ly] and definite[ly]’ intended the beneficiary to benefit from the promised performance.” Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc., 455 Mass. 458, 466 (2009), quoting Anderson v. Fox Hill Village Homeowners Corp., 424 Mass. 365, 366–367 (1997).
“Under Massachusetts law, only intended beneficiaries, not incidental beneficiaries, can enforce a contract.” See Harvard Law School Coalition for Civil Rights v. President and Fellows of Harvard College, 413 Mass. 66, 71 (1992). Where a written contract is unambiguous on the point, as in this case, a court “may determine whether” a person or business that was not a party to the contract “was an intended beneficiary as a matter of law.” The James Family Charitable Foundation v. State Street Bank and Trust Co., 80 Mass. App. Ct. 720, 725 (2011).
The plain language of the Agreement establishes that BTCG and PSA did not intend for Impact Technology Licensing to benefit from and be able to enforce that contract. Section 4.10 provides that “nothing expressed or implied in this Agreement” shall be construed “to give any person, firm or corporation other than the parties hereto any right or remedy under or by reason of this Agreement.” This provision is dispositive. “Where the parties have expressly
 
                                                            -6-
 
and unambiguously stated an intention to exclude third-party beneficiaries, that intent is controlling.” Cumis Ins. Soc'y, 455 Mass. at 464.
Finally, the amended complaint does not allege that BTCG assigned its rights under the Agreement to Impact Technology Licensing, or that Impact Technology Licensing is the legal successor in interest to BTCG.
In sum, the amended complaint and the plain language of the Agreement establish that Impact Technology Licensing lacks standing to sue to enforce the terms of the Agreement. Only BTCG may press those claims.
2.2. “Any Patents” Did Not Mean “All Patents”. The Court finds that the plain and unambiguous wording of § 4.8 of the Agreement provides that the contract term will end upon the expiration of any one of the patents covered by the Agreement, or 15 years from when the Agreement was executed, whichever is later. BTCG’s claim that the reference to the “the expiration of any patents” must be read as meaning “the expiration of all patents” or of “every patent,” and that PSA therefore breached the Agreement by stopping royalty payments before all covered patents have expired, is without merit. The Court will therefore dismiss this prong of Count I.
The Court finds that this aspect of the Agreement is unambiguous, and that its meaning is therefore a question of law that the Court may decide on the pending motion to dismiss. See Eigerman v. Putnam Investments, Inc., 450 Mass. 281, 287 (2007) (affirming dismissal); see also Berkowitz v. President & Fellows of Harvard College, 58 Mass. App. Ct. 262, 270 (2003) (whether language used in a contract “is ambiguous is also a question of law for the court”) (ordering dismissal). Even contracts that are a bit convoluted or hard to parse may be unambiguous. See Sullivan v. Southland Life Ins. Co., 67 Mass. App. Ct. 439, 443 (2006). And the fact that the parties disagree about how to read the Agreement does not automatically make it ambiguous either. See Indus Partners, LLC v. Intelligroup, Inc., 77 Mass. App. Ct. 793, 795 (2010).
The Court recognizes that, in some contexts, the word “any” is used to refer to all things that are at issue. For example, if a borrower contracts to be liable for “any attorneys’ fees and costs” incurred by a lender to collect on a note, that means that the borrower must pay “all” such fees and costs. See Robbins v. Krock, 73 Mass. App. Ct. 134, 138 & 140 (2008). In this sense, “any” refers to “the whole amount of.” See American Heritage Dictionary, 2 Coll. Ed. at 117 (1985) (giving as an example, “will turn over any profit to charity”).
 
                                                            -7-
 
In many other contexts, however, the word “any” is used to mean “one or some, regardless of kind, quantity, or number.” See American Heritage Dictionary, supra (giving as examples, “Take any book you want,” and “Are there any messages for me?”). This is “[t]he standard dictionary definition of ‘any.’ ” Babb v. Wilkie, 589 U.S. 399, 405 n.2 (2020).
To state the point somewhat differently, “[t]he word ‘any’ is commonly understood to mean ‘one, no matter what one’ or ‘one or more indiscriminately from  all those of a kind.’ ” Fortune  Nat. Res. Corp. v. U.S. Dept. of Interior,    806 F.3d 363, 367 n.4 (5th Cir. 2015), quoting Webster's Third New Int'l Dictionary 97 (1976); accord United States v. Gonzales, 520 U.S. 1, 5 (1997) (“read naturally,” the word “any” means “one or some indiscriminately of whatever kind” (quoting Webster’s Dictionary, supra)).
This is the sense in which the contracting parties used the word “any” when referring to “any patents” in § 4.8. If someone holds out a bowl and asks their guest “would you like any cookies?,” that would not mean the guest has only two options, to take no cookies or to take all the cookies; instead, the guest will reasonably understand they are free to take a single cookie of their choice. Similarly here, the Agreement provision that contract termination could be triggered by “the expiration of any patents” unambiguously means, in this context, that the expiration of any one patent will suffice. It makes no difference that § 4.8 refers to “any patents” using a plural noun rather than to “any patent” in the singular. When interpreting a contract as a whole, the “singular may be treated as plural or plural as singular” where that is the most sensible reading. Restatement (Second) of Contracts § 202, comment d (1981).
BTCG’s belief that the Agreement would not terminate until all covered patents expire is irrelevant. A contracting party’s subjective understanding of what they thought their agreement provided cannot trump the plain meaning of unambiguous written contract terms. See, e.g., Eigerman, 450 Mass. at 288 n.8 (parties’ alleged “practical understanding” of how their agreement should be implemented cannot trump unambiguous contract language); Cody v. Connecticut Gen. Life Ins. Co., 387 Mass. 142, 147 n.9 (2007) (parties’ subjective understanding of contract cannot create ambiguity); Herson v. New Boston Garden Corp., 40 Mass. App. Ct. 779, 791–792 (1996) (parties’ “personal understanding” of contract is “irrelevant”).
BTCG’s further assertion that it is “standard to tie royalty streams for a bundle of patents to the last expiration” is also beside the point. If that is what the
 
                                                            -8-
 
contracting parties wanted to do here, it would have been a simple matter to rewrite § 4.8 to say that the Agreement could terminate upon the expiration of “all patents” subject to the contract, rather than upon the expiration of “any patents.” But that is not what the parties agreed to in this case.
The Court may not read into the Agreement a different termination provision that the parties could have adopted but chose not to include. See Automile Holdings, LLC v. McGovern, 483 Mass. 797, 817 (2020) (“We cannot rewrite the contract to cure an oversight or relieve a party from the consequences of the failure to adhere to its plain terms.”) (quoting National Med. Care, Inc. v. Zigelbaum, 18 Mass. App. Ct. 570, 575–576 (1984)); Acushnet Company v. Beam, Inc., 92 Mass. App. Ct. 687, 695 (2018) (“Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.”) (quoting Vermont Teddy Bear Co. v. 438 Madison Realty Co., 1 N.Y.3d 470, 475 (2004)).
Instead, the plain and unambiguous language of § 4.8 “must be enforced according to its terms.” See A.L. Prime Energy Consultant, Inc. v. Mass. Bay Transp. Auth., 479 Mass. 419, 428 (2018), quoting Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992). “[S]ophisticated parties are bound by the terms of their agreement. Even if the bargain they strike ends up a bad deal for one or both parties, the court’s role is to enforce the agreement as written.” Glaxo Grp. Ltd. v. DRIT LP, 248 A.3d 911, 919 (Del. 2021). Since BTCG and PSA are sophisticated parties that “choose to embody their agreement in a carefully crafted document,” they must be “held to the language they chose.” Fronk v. Fowler, 71 Mass. App. Ct. 502, 508 (2008), quoting Anderson St. Assocs. v. Boston, 442 Mass. 812, 819 (2004).
Though BTCG embeds its incorrect legal arguments as to the meaning of § 4.8 in the amended complaint, those conclusory allegations cannot defeat Defendants’ motion to dismiss. In deciding a rule 12(b)(6) motion, the Court must “look beyond the conclusory allegations in the complaint and focus on whether the factual allegations plausibly suggest an entitlement to relief.” Maling v. Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, 473 Mass. 336, 339 (2015), quoting Curtis v. Herb Chambers I–95, Inc., 458 Mass. 674, 676 (2011). In other words, the Court must accept as true only the facts alleged in the complaint, not any “legal conclusions cast in the form of factual allegations.” Cubberley v Commerce Ins. Co., 495 Mass. 289, 293–293 (2025), quoting Leavitt v. Brockton Hosp., Inc., 454 Mass. 37, 39 n.6 (2009).
 
                                                            -9-
 
Where material provisions of a contract are unambiguous, as in this case, a court “cannot accept the bare assertion in the plaintiff’s complaint” that the opposing party is liable for breach of the contract if that assertion is based on a misreading of the contract. See Eigerman, 450 Mass. at 287 (affirming dismissal of contract claim); accord Flomenbaum v. Commonwealth, 451 Mass. 740, 751–752 & n.12 (2008) (granting motion to dismiss because plain language of contract made clear that Commonwealth could terminate chief medical examiner before completion of five-year term).
2.3. No Factual Allegation Suggesting any Contract Modification. BTCG has also failed to state a viable claim that the contracting parties agreed in 2015 to modify the Agreement to provide that it would not terminate until the expiration of “all patents” covered by the contract, and that PSA breached the Agreement as modified by ending royalty payments in February 2024. The Court will therefore dismiss this prong of count I as well.
“A valid contract modification requires mutual assent and consideration.” Okerman v. VA Software Corp., 69 Mass. App. Ct. 771, 781 (2007). But the factual allegations in the amended complaint do not plausibly suggest that Plaintiffs sought or that PSA agreed to modify the Agreement to change the termination provision. Nor do they plausibly suggest that Plaintiffs provided consideration for the purported modification.
The amended complaint alleges that:
o          In July 2015, PSA asked Plaintiffs to “remove the patent expiration- related term from the Agreement’s termination clause” and “set the termination date for the Agreement to be only 15 years from the date of execution.”
o          Plaintiffs rejected that proposal.
o          The next day, Plaintiffs’ representative sent an email to PSA asserting that (I) the existing contract term provision “has significant benefits to PSA” because it gives Plaintiffs a financial incentive “to develop new patent coverage and new technology innovations that extend PSA’s exclusivity in the marketplace,” and (ii) it therefore is “justifiable” to “maintain[] the agreement through the life of the patents” and also “justifiable that IMPACT remain a part of this benefit until the expiration of the IP estate.”
 
                                                            -10-
 
o          PSA’s representative responded by writing: “I agree 110% with you. Thanks for your insightful comment.”
Nothing in this course of events and email exchange would support an inference that the parties had agreed to modify § 4.8 to provide that the Agreement will not terminate until the later of (a) 15 years after the date of execution, or (b) the expiration of “all patents” related to the technology field covered by the Agreement. And the amended complaint does not allege any other circumstances or conduct that could support an inference that the parties had agreed to modify the termination provision.
The July 2015 email sent by Plaintiffs does not state or imply that BTCG was asking PSA to agree to a contract modification. To the contrary, when read in context of the facts alleged in the amended complaint, the email was merely providing an explanation of why Plaintiffs had rejected PSA’s proposal to have the Agreement terminate after 15 years. Since Plaintiffs were not proposing any change in the contract language, PSA’s email response cannot support any inference that PSA was giving “mutual assent” to a contract modification.
Nor do Plaintiffs allege any facts plausibly suggesting that they provided PSA any consideration for an alleged change in the terms of the Agreement.
In the absence of any factual allegations suggesting either an agreement to modify the Agreement or any consideration to support such a modification, Plaintiffs’ claim that the Agreement was modified and that PSA later breached the modified contract fails as a matter of law.
2.4. Alleged Breach by Not Maintaining Russian Patent. In count V, BTCG asserts that PSA’s contractual obligation to pay all costs associated with patent maintenance included an obligation to pay all fees needed to keep patents in force, and that PSA breached this obligation by not paying the annual maintenance fee on a Russian patent and thereby letting that patent lapse in April 2014. The Court concludes that this is a viable claim and will deny the request to dismiss Count V.
Section 4.6(e) of the Agreement provides that PSA “agrees to pay all costs associated with patent prosecution, maintenance, defense, and enforcement.” PSA contends that, even though it agreed to pay all patent maintenance costs, it was nonetheless free to pick and choose which patents to keep alive, and to stop paying maintenance costs on any patents that it opted to let lapse. This interpretation arguably “deprives the … clause” requiring PSA to pay all
 
                                                            -11-
 
patent maintenance costs “of all force.” See XCO Intern. Inc. v. Pacific Scientific Co., 369 F.3d 998, 1003 (7th Cir. 2004) (rejecting essentially identical argument regarding substantively identical contract provision in patent licensing agreement). The fact that BTCG transferred to PSA “all of its right, title and interest to an in” a specified field of intellectual property in § 4.1 of the Agreement does not necessarily mean that PSA had absolute discretion to decide whether to keep a particular patent in force or permit it to lapse by not paying a maintenance fee.
If the contract language in § 4.6(e) does not clearly require PSA to make reasonable efforts to pay all fees required to maintain all covered patents, as BTCG contends, then it is ambiguous. And if the provision is ambiguous, then its meaning “is a question of fact to be determined at trial,” not a question of law that the Court may resolve based only on the pleadings. See Seaco Ins. Co. v. Barbosa, 435 Mass. 772, 779 (2002). Either way, PSA is not entitled to dismissal of this claim.
2.5. Alleged Breach by Treating Patent Lapse as an “Expiration”. BTCG has also stated a valid claim that PSA breached the Agreement by treating the lapse of a Russian patent as if it were an “expiration” of a patent within the meaning of § 4.8 of the Agreement, and on that basis ending all royalty payments as of February 2024. The Court will therefore deny the request to dismiss this prong of count I.
The Court concludes that the reference to “expiration” is ambiguous because it is not defined in the Agreement, it is not self-defining, and it can reasonably be interpreted in more than one way. See Kobayashi v. Orion Ventures, Inc., 42 Mass. App. Ct. 492, 496–497 (1997) (noncompetition provision in lease that barred “other delis” was ambiguous because “deli” was not defined, was not self- defining, and parties reasonably disagreed about its meaning) ; see also Fecteau Benefits Group, Inc. v. Knox, 72 Mass. App. Ct. 204, 210–211 (2008) (contract provision governing work “started” before year end was ambiguous); see generally Wortis v. Trustees of Tufts College, 493 Mass. 648, 663 (2024) (contract language is ambiguous where it could reasonably be interpreted in more than one way).
This aspect of § 4.8 is ambiguous because the two sides have both suggested completely reasonable, but entirely inconsistent, interpretations. Perhaps the word “expiration” is best understood as encompassing any and all terminations of a patent, including the lapse of a patent because PSA chose or
 
                                                            -12-
 
otherwise failed to pay a modest patent maintenance fee, as PSA contends. Or perhaps the term covers only the expiration of a patent at the end of its term or because it is later found to be invalid, as BTCG contends. Neither United States patent law nor Russian patent law is automatically dispositive as to what this ambiguous contract provision means.
Since the reference to a patent “expiration” is ambiguous, its meaning “is a question of fact to be determined at trial,” or possibly on a motion for summary judgment, but is not a question of law that the Court may resolve based only on the pleadings. See Seaco Ins., 435 Mass. at 779. The parties are entitled to present competent parol evidence regarding the meaning of this ambiguous contract term.[3] See Kobayashi, 42 Mass. App. Ct. at 496. They are also entitled to present any evidence that the Agreement was drafted by one side or the other, and that the ambiguity can therefore be resolved by construing this provision against the drafter.[4] The Court cannot address or resolve these issues on a rule 12(b)(6) motion to dismiss.
PSA contended during oral argument that in the context of patents the word “expiration” is a term of art. Perhaps so. But that is something that must be proved with evidence, not an assertion that the Court may accept at face value in deciding the motion to dismiss. “The existence and scope of a usage of trade
 
--------------------------------------------
 
[3] Not all extrinsic evidence about the meaning of an ambiguous contract term is admissible. For example, a party’s uncommunicated subjective intent as to the meaning of a contract is irrelevant. The meaning and effect of a contract “is not to be determined by the secret thought or unexpressed intent of any of the parties, but is to be determined by the intent as expressed by words and acts of all the parties in the light of the circumstances.” Tudor Press v. Univ. Distrib. Co., 292 Mass. 339, 341 (1935). In other words, “contracts rest on objectively expressed manifestations of intent,” and cannot be altered by “subjective and unexpressed expectations” of one party or side. Beatty v. NP Corp., 31 Mass. App. Ct. 606, 612 (1991).
[4] An ambiguous written contract must be construed “strongly against the party who drew it.” See Leblanc v. Friedman, 438 Mass. 592, 599 n.6 (2003), quoting Bowser v. Chalifour, 334 Mass. 348, 352 (1956). In other words, “[t]he author of the ambiguous term is held to any reasonable interpretation attributed to that term which is relied on by the other party.” James B. Nutter & Co., 478 Mass. at 669, quoting Merrimack Valley Nat’l Bank v. Baird, 372 Mass. 721, 274 (1977). This canon of construction “resolves ambiguity against the drafter” and turns what otherwise would be an uncertain instrument into an unambiguous contract. Boland v. George S. May Int'l Co., 81 Mass. App. Ct. 817, 827 (2012); accord, e.g., Costa v. Brait Builders Corp., 463 Mass. 65, 76 (2012).
 
                                                            -13-
 
are questions of fact.” Affiliated FM Ins. Co. v. Const. Reinsurance Corp., 416 Mass. 839, 846 (1994). Where “contract language is ambiguous, evidence of trade usage is admissible to determine the meaning of the agreement.” Id. at 845. In addition, such evidence is also admissible to show that terms that appear “unambiguous according to their well-known ordinary meaning” were instead used in a contract to convey a different meaning “acquired by usage of trade … in the particular trade or profession.” 12 Williston on Contracts § 34:1 (4th ed.); accord Coffin v. Bowater Inc., 501 F.3d 80, 97 (1st Cir. 2007) (extrinsic evidence may be offered to show that a contract is ambiguous where the parties have used “a term that, while signifying one thing in common parlance, designates something particular within the industry's jargon”). Such evidence is admissible only if the purported usage is truly “universal” and so “notorious” by “long and uniform practice” that one can fairly presume “that both parties knew of it, and contracted accordingly.” Barrie v. Quimby, 206 Mass. 259, 265 (1910); accord Caggiano v. Marchegiano, 327 Mass. 574, 579 (1951); Acushnet Co. 92 Mass. App. Ct. at 700 (applying New York law). These are factual issues that cannot be resolved on a motion to dismiss.
2.6. No Factual Allegation Suggesting any Assignment. The factual allegations in the amended complaint do not plausibly suggest that PSA assigned any of its rights or obligations under the Agreement to Carr or to Barry-Wehmiller. The Court will therefore dismiss the portion of count I alleging that PSA breached the provision of the Agreement that bars such assignments without BTCG’s consent.
Section 4.12 of the Agreement provides that, “This agreement shall not be assigned or transferred directly or indirectly by either party without the prior written consent of the other party. Any assignment or transfer in violation of this provision shall be void.”
BTCG alleges in ¶ 134 of the amended complaint that around late 2022 “Barry- Wehmiller transferred the administration and operation of the centrifuge business to the newly formed CARR, leaving PSA without any ability or funds to perform or administer the contract.”
This allegation does not plausibly suggest that PSA assigned its rights and obligations under the Agreement, because the Agreement does not require PSA to run any centrifuge business itself.
The amended complaint makes clear that, by late 2022, PSA had completed the only operational requirement imposed by the Agreement. Section 4.2 required
 
                                                            -14-
 
PSA to proceed with Phase 2 development as “required to convert the pilot- scale prototype into a commercial product as generally described in this document.” The rest of the document that encompasses the Agreement makes clear that the prototype referred to in § 4.2 was the prototype for the original UniFuge product. The amended complaint makes clear that Phase 2 development needed to commercialize the UniFuge product was completed years ago. Indeed, ¶ 64 alleges that the UniFuge “has become an extremely successful product.”
Nothing in the Agreement requires PSA to undertake any other administration or operation of the centrifuge business. PSA, as the sole owner of the relevant intellectual property, was free under the Agreement to run the centrifuge business itself, hire someone else to do so, transfer the business to another entity, sell the business, or even to shut the business down completely. The only continuing obligation owed by PSA was to pay royalties to BTCG calculated based on all revenues that PSA or any affiliate may receive from any commercial exploitation of the covered field of technology.
The Agreement did not give BTCG any right to control the administration or operation of any centrifuge business using the covered technology, and imposed no obligation on PSA to run any such business itself. Indeed, other than the provision requiring Phase 2 development of the original UniFuge product, the Agreement does not govern the centrifuge business that PSA had been operating at all.
It follows that the allegation that PSA transferred administration and operation of its centrifuge business to Carr does not plausibly suggest that PSA breached the Agreement’s non-assignment provision. Plaintiffs’ conclusory assertion that PSA assigned its rights and obligations under the Agreement does not state a claim without any supporting  factual  allegations.  See  Maling,  473 Mass. at 339.
3. Promissory Estoppel. In count XIV, Plaintiffs try to repackage their claim that PSA agreed to modify the Agreement, and then breached the revised contract, into what they call a claim for “promissory estoppel.” The Court will allow the request to dismiss count XIV because the existence of an enforceable written contract covering the same subject matter bars any alternative claim for violation of an implied contract formed by promissory estoppel.
A claim for promissory estoppel is a claim that the defendant breached a contract that was formed not by an exchange of consideration but, instead, by
 
                                                            -15-
 
reasonable reliance on a promise. “When a promise is enforceable in whole or in part by virtue of reliance, it is a ‘contract,’ and it is enforceable pursuant to a ‘traditional contract theory’ antedating the modern doctrine of consideration.” Rhode Island Hosp. Trust Nat. Bank v. Varadian, 419 Mass. 841, 849 (1995), quoting Loranger Constr. Corp. v. E.F. Hauserman Co., 376 Mass. 757, 760–761 (1978). “Detrimental reliance on an offer or a promise (also known as promissory estoppel) is a substitute for consideration. Therefore, an offer that reasonably induces the other party to act is enforceable as a contract in the same manner as any other contract to the extent necessary to avoid injustice.” Johnny's Oil Co. v. Eldayha, 82 Mass. App. Ct. 705, 714 (2012).
The Supreme Judicial Court has cautioned “that the term ‘promissory estoppel’ should not be used in deciding cases under this principle because that term ‘tends to confusion’ and overlooks the point that” a promise enforceable on the basis of detrimental reliance is enforced through a claim for breach of contract. Cataldo Ambulance Serv., Inc. v. City of Chelsea, 426 Mass. 383, 386 n.6 (1998), quoting Varadian,  419 Mass. at 849, and Loranger Constr., 376 Mass. at 761.       “ ’Promissory estoppel is an equitable doctrine’ that ‘[i]n the absence of a contract in fact, ... implies a contract in law.’ ” Vacca v. Brigham & Women's Hosp., Inc., 98 Mass. App. Ct. 463, 472 (2020), quoting Malden Police Patrolman’s Ass’n v. City of Malden, 92 Mass. App. Ct. 53, 60 (2017).
Plaintiffs’ “promissory estoppel” claim fails because there can be no such claim to enforce an implied contract where the same parties entered into an “express contract covering the same subject matter.” Zarum v. Brass Mill Materials Corp., 334 Mass. 81, 85 (1956). In other words, “[w]here an enforceable contract exists, … a claim for promissory estoppel will not lie.” Wortis, 493 Mass. at 672 n.13, quoting Malden Police Patrolman’s Ass’n, 92 Mass. App. Ct. at 61.
The amended complaint acknowledges that BTCG and PSA entered into a written technology transfer agreement to govern their rights and obligations with respect to the transfer of certain intellectual property to PSA. In turn, PSA concedes that the Agreement is enforceable. As discussed above, that contract contains an express termination provision. Since it is undisputed that BTCG entered into an enforceable contract with PSA, it may not sue on a promissory estoppel theory to enforce a different implied contract.
4. Unjust Enrichment. The Court will allow the request to dismiss the claim for unjust enrichment in count IV for much the same reason. Plaintiffs may not seek unjust enrichment damages because their rights are defined by an
 
                                                            -16-
 
undisputedly valid written contract with PSA. See Metropolitan Life Ins. Co. v. Cotter, 464 Mass. 623, 641 (2013); Boston Med. Ctr. Corp. v. Secretary of Executive Office of Health & Human Servs., 463 Mass. 447, 467 (2012).
The Agreement provides that BTCG’s compensation for the technology that it has transferred or may transfer to PSA are royalties as defined in § 4.3. Since the subject matter of the compensation for the transferred technology is governed by the Agreement, Plaintiffs may not seek additional compensation under an unjust enrichment theory. See Zarum v. Brass Mill Materials Corp., 334 Mass. 81, 85 (1956) (plaintiff may not seek recovery on principles of unjust enrichment where valid contract covers subject matter of dispute).
Though Plaintiffs did not contract with Barry-Wehmiller or Carr, that does not matter. “The rule barring unjust enrichment” where “a valid contract covers the subject matter of the parties’ dispute” applies not only “when a plaintiff seeks to recover from the party with whom he expressly contracted but also … when a plaintiff seeks to recover from a third party to the contract who benefited from its performance.” ConocoPhillips Co. v. Koopmann, 542 S.W.3d 643, 663–664 (Tex. App. 2016) (parent corporation could not be sued for unjust enrichment where subject matter of dispute was covered by contract with wholly-owned subsidiary), aff'd on other grounds, 547 S.W.3d 858 (Tex. 2018); accord, e.g., KBX, Inc. v. Zero Grade Farms, 639 S.W.3d 352, 364–366 (Ark. 2022); LaRoss Partners, LLC v. Contact 911 Inc., 874 F.Supp.2d 147, 165–166 (E.D.N.Y. 2012) (applying New York law and dismissing claim). The amended complaint alleges that Barry-Wehmiller and Carr benefitted, directly or indirectly, from BTCG’s performance under the Agreement.
5. Tortious Interference. In count VII, Plaintiffs claim that Barry-Wehmiller and Carr intentionally interfered with BTCG’s rights under the Agreement by transferring administration and operation of PSA’s centrifuge business to Carr. This claim fails for two, independent reasons. First, as discussed above, the facts alleged in the amended complaint do not plausibly suggest that the transfer of responsibilities to Carr violated the Agreement. Second, the facts alleged also do not plausibly suggest that Barry-Wehmiller or Carr had any improper motive or used any improper means. The Court will therefore allow the request to dismiss this claim for tortious interference with a contract.[5]
 
--------------------------------------------
 
[5] Though Count VII is labelled as a claim for “tortious interference with contractual or advantageous relationship,” it only alleges interferences with
<continued…>
 
                                                            -17-
 
To state a claim for intentional interference with contractual relations, a party must allege facts plausibly suggesting that: “(1) [it] had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant’s interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions.” Weiler v. PortfolioScope, Inc., 469 Mass. 75, 84 (2014), quoting G.S. Enters., Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272 (1991).
5.1. No Underlying Breach of Contract. If the third party did not breach their contract, then a defendant cannot be held liable for tortiously interfering with a contract. See JNM Hospitality, Inc. v. McDaid, 90 Mass. App. Ct. 352, 354–55 & 357 (2016) (where landlord did not breach lease by failing to make nonexclusive parking spaces available to customers of restaurant lessee, third party could not be liable for intentionally interfering with lease to detriment of tenant); Cavicchi v. Koski, 67 Mass. App. Ct. 654, 661 (2006) (where clients did not breach contingent fee agreements when they discharged attorney, new lawyer who convinced them to do so could not be liable for intentional interference with contract).
As discussed above in § 2.6 of this decision, the facts alleged in the amended complaint do not plausibly suggest that any transfer to Carr of responsibility for administration and operation of PSA’s centrifuge business would constitute a breach of contract. Without allegations plausibly suggesting that PSA was induced to breach its contract, the amended complaint fails to state a viable claim against Barry-Wehmiller or Carr for tortious interference.
5.2. No Improper Motive or Means. This claim also fails for the further reason that Defendants make no factual allegation plausibly suggesting that any transfer of responsibility for the centrifuge business to Carr was improper in motive or means.
Plaintiffs allege that Barry-Wehmiller and Carr were purportedly motivated by a desire to obtain benefits without paying for them, meaning to operate a business using intellectual property that BTCG had transferred to PSA without continuing to pay royalties under the Agreement. This allegation does not state a viable claim because “advancing one’s own economic interest, by itself, is not
 
--------------------------------------------
 
the  Agreement  between  BTCG  and  PSA.  As result  this  claim  must  be for tortiously inducing a breach of contract, not for interfering with a non- contractual advantageous business relationship. See Cachopa v. Town of Stoughton, 72 Mass. App. Ct. 657, 658 n.3 (2008).
 
                                                            -18-
 
an improper motive” for the purpose of a tortious interference claim. See Skyhook Wireless, Inc. v. Google Inc., 86 Mass. App. Ct. 611, 621 (2014); accord, e.g., United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 817 (1990); Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc., 68 Mass. App. Ct. 582, 608 & 609 (2007); Pembroke Country Club, Inc. v. Regency Sav. Bank, F.S.B., 62 Mass. App. Ct. 34, 39 (2004).
Plaintiffs also make the conclusory allegation that Barry-Wehmiller wanted “to punish and harm” the Plaintiffs. But this conclusion is not supported by any of the factual allegations in the amended complaint, and therefore does not suffice to state a claim. See Maling, 473 Mass. at 339. The allegation in ¶ 127 of the amended complaint that Barry-Wehmiller felt “resentment towards the Agreement” and felt “ire” at having to continue to pay royalties to BTCG is an allegation that Barry-Wehmiller was motivated by economic self-interest, nothing more.
Nor does the amended complaint plausibly suggest that Barry-Wehmiller used any improper means to transfer administration and operation of the centrifuge business to Carr. To state a claim for tortious interference based on “improper means,” Plaintiffs must allege facts plausibly suggesting that Barry-Wehmiller and Carr carried out their tortious interference by engaging in “improper conduct beyond the fact of the interference itself.” Bartle v. Berry, 80 Mass. App. Ct. 372, 380 (2011). They have failed to do so.
Though Plaintiffs allege that Defendants have tried to conceal the fact that they are selling a competing product, in order to keep Plaintiffs from learning that a “Triggering Event” has occurred—which under the Agreement would allegedly mean that BTCG now has an automatic, exclusive license to the all of the technology covered by the contract—nothing in the amended complaint suggests that this alleged misrepresentation was a means by which Barry- Wehmiller transfer the centrifuge business to Carr.
“Under Massachusetts law, … a viable claim for interference with a contractual or advantageous relationship requires allegations that ‘that the defendant knowingly and for an improper purpose or by improper means induced a party to breach a contract or not to enter into or continue a business relationship, resulting in damage.’ ” Vranos v. Skinner, 77 Mass. App. Ct. 280, 290–291 (2010) (affirming dismissal), quoting Buster v. George W. Moore, Inc., 438 Mass. 635, 652 (2003). In other words, Plaintiffs must allege facts plausibly
 
                                                            -19-
 
suggesting that alleged misrepresentations by Barry-Wehmiller and Carr caused PSA to breach the Agreement. Bartle, 80 Mass. App. Ct. at 381.
But Plaintiffs do not allege that Barry-Wehmiller or Carr induced PSA to breach the Agreement by making any misrepresentations. Allegations of misrepresentations that did not cause PSA to allegedly breach the contract by transferring administration and operation of its centrifuge business to Carr do not suggest that intentionally used an improper means to interfere with BTCG’s contract rights.
6. Breach of Fiduciary Duty. In count VI, Plaintiffs contend that BTCG and PSA executed the Agreement in order to enter “into a joint venture for the development and marketing of new single-use centrifuge technology,” as a joint venturer PSA owed fiduciary duties to both Plaintiffs, and PSA breached those fiduciary duties. The Court will allow the request to dismiss this claim because the facts alleged in the amended complaint do not plausibly suggest that PSA entered into a joint venture with either Plaintiff.
A “joint venture” is “similar to a partnership; it differs from a partnership in that it is ordinarily limited to a single enterprise,” National Sch. Bus Serv., Inc. v. Comm'r of Dept. of Emp. & Training, 49 Mass. App. Ct. 445, 453 n.13 (2000), or “to a single transaction,” Gurry v. Cumberland Farms, Inc., 406 Mass. 615, 623 (1990). The Partnership Act, G.L. c. 108A, “is generally applicable to joint ventures by analogy, though it does not govern directly.” BPR Grp. Ltd. P'ship v. Bendetson, 453 Mass. 853, 861 (2009), quoting Doiron v. Castonguay, 401 Mass. 705, 707 n. 2 (1988). Like partners, joint venturers have a “fiduciary relationship,” Judge v. Gallagher, 17 Mass. App. Ct. 636, 642 (1984), and therefore owe each other a duty of utmost good faith and loyalty, DeCotis v. D'Antona, 350 Mass. 165, 168 (1966).
A joint venture is formed only when the participants in a business enterprise intend to operate as joint venturers who will share in all aspects of and responsibility for their shared business. Shain Inv. Co., Inc. v. Cohen, 15 Mass. App. Ct. 4, 7–9 (1982) (“As among the parties, the existence of a partnership or a joint venture depends upon their intent to associate as such.”). “In Massachusetts, factors indicating such an intent include an agreement among the participants for joint profits and a sharing of losses; a contribution of money, assets, talents, etc., to a common undertaking; a joint property interest in the subject matter of the venture; and a right to participate in the control of the venture.” Gurry, 406 Mass. at 623–624.
 
                                                            -20-
 
The amended complaint enumerates and makes conclusory assertions (unsupported by factual allegations) as to each element typically considered in deciding whether parties formed a joint venture. That does not suffice to state a claim. “Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.” Doe v. American Guar. & Liab. Co., 91 Mass. App. Ct. 99, 105 (2017), quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). “While ‘detailed factual allegations’ are not required at the pleading stage, mere ‘labels and conclusions’ will not survive a motion to dismiss.” Burbank Apartments Tenant Ass’n v. Kargman, 474 Mass. 107, 116 (2016), quoting Iannacchino, 451 Mass. at 636.
This claim fails because the Agreement expressly states that the parties were not intending to enter into a joint venture, Plaintiffs had no right to control the centrifuge business involving technology that BTCG transferred to PSA, and the Agreement makes clear that Plaintiffs had no right to share in any profits of or responsibility to share in losses incurred by that enterprise. Without any intent to associate as joint venturers, any right for Plaintiffs to share in control, or any right or obligation to share in profits and losses, no joint venture could have been formed.
First, the Agreement makes clear that PSA did not intend to enter into a joint venture with either of the Plaintiffs. “The key requirement” to establish a joint venture “is an intent to associate” as joint venturers. Gurry, 406 Mass. at 623; accord Cardullo v. Landau, 320 Mass. 5, 8 (1952) (“the relationship of joint adventurers is a matter of intent and arises only when they intend to associate themselves as such”). The Agreement provides in § 4.13 that BTCG “shall be an independent contractor with respect to” PSA, and “shall not be an employee, agent or joint venturer of” PSA. This establishes that, from February 2009 onward, “the parties did not intend to be treated as partners or participants in a joint venture,” and therefore were not joint venturers. See Linkage Corp. v. Trustees of Bos. Univ., 425 Mass. 1, 23 (1997) (contract provision stating that business was “an independent contractor … not an agent or employee of the University” established that parties were not joint venturers).
Second, the Agreement also makes clear that Plaintiffs had no right to exercise any control over the centrifuge business that PSA planned to develop using technology transferred to it by BTCG. “ ’A right of mutual control or management of the enterprise’ is an essential element of joint venture.” Shain Inv., 15 Mass. App. Ct. at 9, quoting 2 Williston on Contracts § 318A, at 563– 564, 570, 579 (3d ed. 1959). As discussed above in § 2.6 of this decision, the
 
                                                            -21-
 
Agreement did not give BTCG any right to control the administration or operation of any centrifuge business using the covered technology. Since the Agreement did “not a provide a vehicle for joint control” of a business enterprise, it could not have created a joint venture. See Shain Inv., 15 Mass. App. Ct. at 7.
Third, the Agreement establishes as well that Plaintiffs had no right to share in any profits, and no obligation to share in any losses, generated by the centrifuge business that PSA planned to develop using covered technology.
An ”intent to share profits and losses” is an “important component” of a joint venture. Massachusetts Prop. Ins. Underwriting Ass'n v. Georgaklis, 77 Mass. App. Ct. 358, 362 (2010); see also Boyer v. Bowles, 310 Mass. 134, 138 (1941) (partnership or joint venture exists where there is “a voluntary contract of association for the purpose of sharing the profits and losses, as such, which may arise from the use of capital, labor or skill in a common enterprise, and an intention on the part of the principals to form a partnership for that purpose.” (quoting Mitchell v. Gruener, 251 Mass. 113, 123 (1925)).
The Agreement requires that PSA pay BTCG a royalty equal to a fixed percentage of gross revenue. That is not a right to share in profits. PSA is required to pay the same royalty for a given amount of gross revenue whether it barely broke even and made essentially no profits, or made huge profits on those sales. Plaintiffs’ conclusory assertion that the contractual royalty provision “was implicitly a share of profits” is wrong as a matter of law and unsupported by any factual allegations.
Nor does the Agreement require BTCG to shoulder any portion of losses that PSA might incur in running the centrifuge enterprise. Plaintiffs’ allegation that “each party was responsible for its own ‘losses’ ” is beside the point. For there to be a joint venture, the participants must have agreed to share in the profits and losses of a jointly run enterprise. That Plaintiffs are responsible for the losses of their own, separate businesses does not plausibly suggest any intent to enter into a joint venture.
“Profit sharing and joint control have been considered essential to the existence of a true joint venture.” Searcy v. Paul, 20 Mass. App. Ct. 134, 147 (1985). As a result, cooperation in running a business does not establish a joint venture where the parties did not share in both profits and losses generated by the business. Id. at 146–147; see also Gannett v. Lowell, 16 Mass. App. Ct. 325, 330 (1983) (where parties never manifested any “intent to create a partnership or
 
                                                            -22-
 
joint venture,” and their agreement made “no provision for sharing losses or joint control of performance,” mere agreement that investor would share in profits did not create partnership).
In sum, since the facts alleged in the amended complaint does not plausibly suggest that PSA had any intent to enter into a joint venture, and plaintiffs allege no other factual basis suggesting that PSA owed any fiduciary duty to either plaintiff, the amended complaint fails to state a viable claim for breach of fiduciary duty. Cf. Gannett, supra.
7. Aiding and Abetting Breach of Fiduciary Duty. Since the facts alleged in the amended complaint do not plausibly suggest that PSA owed Plaintiffs any fiduciary duty, it follows that the pleading does not state a viable claim that Barry-Wehmiller or Carr committed the tort of aiding and abetting a breach of fiduciary duty by PSA. There can be no liability for aiding and abetting a breach of fiduciary duty in the absence of an underlying breach of fiduciary duty. See Arcidi v. National Ass’n of Govt. Employees, Inc., 447 Mass. 616, 623–624 (2006). The Court will therefore allow the request to dismiss count X.
8. Chapter 93A Claims. Plaintiffs assert three claims for violation of G.L. c. 93A, based on three different theories of liability, in counts II, III, and VIII.
8.1. Conduct in Massachusetts. Defendants argue that the c. 93A claims must all be dismissed because Plaintiffs did not plead facts sufficient to show that “the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth.” Kuwaiti Danish Computer Co. v. Digital Equip. Corp., 438 Mass. 459, 473 (2003). This argument is without merit.
The burden of proof will be on Defendants to prove that their allegedly unfair or deceptive conduct did not occur primarily and substantially in Massachusetts. See G.L. c. 93A, § 11; Kuwaiti Danish Computer, 438 Mass. at 470.
As a result, Plaintiffs are not required to plead facts sufficient to withstand a defense that that the center of gravity of his claim is not within Massachusetts. Resolute Mgmt., Inc. v. Transatlantic Reins. Co., 87 Mass. App. Ct. 296, 301 (2015) (reversing dismissal of claim under G.L. c. 93A, § 11).
8.2. “Stringing Along” Theory. Count II asserts that PSA deceived the Defendants by pretending that it would recognize the Agreement’s termination date as being the date when the last covered patent expired, even though “Defendants secretly planned to assert that the lapse of the Russian patent
 
                                                            -23-
 
would trigger the termination of [BTCG’s] royalty rights in February 2024,” and that this tricked Defendants into developing for PSA’s benefit “virtually the entire technology of the new U2K centrifuge.” This count states a viable claim against PSA, but not against Barry-Wehmiller or Carr.
One “recognized form of commercial extortion” that can violate G.L. c. 93A, § 11, “is the ‘stringing along’ of a business counterparty.” H1 Lincoln, Inc. v. S. Washington St., LLC, 489 Mass. 1, 16 (2022). “Stringing along tactics involve the use of a protracted ‘pattern of conduct ... calculated to misrepresent the true situation’ to the target business and thereby induce detrimental reliance on the target's part.” Id., quoting Greenstein v. Flatley, 19 Mass. App. Ct. 351, 356 (1985).
The facts alleged in the amended complaint plausibly suggest that PSA engaged in conduct that violated c. 93A in this manner. Plaintiffs allege that that “PSA specifically led [Plaintiffs] to believe and rely upon” representations in a July 2015 email sent on behalf of PSA concerning when the Agreement would terminate. Whether this one email suffices to prove this claim, or whether Plaintiffs can muster any other supporting evidence, remains to be seen. But count II states a viable claim against PSA. The Court will therefore deny the request to dismiss count II as against PSA.
In contrast, nothing alleged in the complaint plausibly suggests that Barry- Wehmiller or Carr participated in this allegedly misleading conduct. The Court will therefore allow the request to dismiss count II as against these defendants.
Plaintiffs may not lump all three defendants together in asserting this claim, when the sale factual basis for the claim is allegedly unfair and deceptive conduct by PSA alone.
“In order to satisfy the minimal requirements of notice pleading, a plaintiff cannot ‘lump’ multiple defendants together and must ‘state clearly which defendant or defendants committed each of the alleged wrongful acts.’ ” Canales v. Gatzunis, 979 F. Supp. 2d 164, 170 (D. Mass. 2013) (Tauro, J.), quoting Bagheri v. Galligan, 160 Fed.Appx. 4, 5 (1st Cir.2005) (affirming dismissal); accord Schlumberger Technology Corp. v. ARE-MA Region No. 103, LLC, Suffolk Super. Ct. civ. a. 2384CV02767-BLS1, slip op. at 4–5, 2024 WL 2091831, at *2, 2024 Mass. Super. LEXIS 40, at *5 (Mass. Super. April 8, 2024) (Krupp, J.) (dismissing complaint because “ ‘lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct’ failed to give adequate notice of claims”) (quoting Atuahene v. City of Hartford, 10 Fed. Appx. 33, 34 (2d Cir. 2001) (affirming dismissal)).
 
                                                            -24-
 
Referring “collectively to the ‘defendants’ “ in a complaint—as Plaintiffs do in ¶ 184 of the amended complaint, for example—“is impermissible when it cannot be reasonably inferred that all defendants were involved in a particular aspect of the alleged misconduct.” Davis v. McDonald, No. 21-CV-10571-LTS, 2021 WL 3022138, at *2 (D. Mass. July 16, 2021) (Sorokin, J.).
That Barry-Wehmiller was PSA’s parent and Carr was an affiliate of PSA also provides no basis for asserting any claim that they can be held liable based on PSA’s alleged misconduct. One of the “bedrock principles of corporate common law” is that separate corporations or limited liability companies are generally “regarded as separate and distinct entities,” even if there are “relationships between or among them.” Lemos v. Electrolux North America, Inc., 78 Mass. App. Ct. 376, 381 (2010), rev. denied, 459 Mass. 1103 (2011), quoting Scott v. NG US 1, Inc., 450 Mass. 766, 766 (2008); accord Kraft Power Corp. v. Merrill, 464 Mass. 145, 148 (2013) (“It is a general principle of corporate law ‘deeply “ingrained in our economic and legal systems” that a parent corporation ... is not liable for the acts of its subsidiaries.’ ”) (quoting United States v. Bestfoods, 524 U.S. 51, 61 (1998), quoting in turn Douglas & Shanks, Insulation from Liability Through Subsidiary Corporations, 39 Yale L.J. 193, 193 (1929)); Manufacturing Improvement Corp. v. Georgia Pacific Corp., 362 Mass. 398, 400-401 (1972) (affirming dismissal because complaint did not identify any basis for holding corporate parent liable for subsidiary’s alleged breach of contract).
8.3. “Assignment” Theory. Count III asserts that PSA violated the Agreement by assigning its rights under the Agreement to Carr, and that this purportedly violated G.L. c. 93A by depriving Plaintiffs of the leverage that the contractual prohibition on assignments without consent had given them. The Court will allow the request to dismiss this claim for several reasons.
First, the premise of this claim is incorrect. As discussed above in § 2.6 of this decision, any assignment to Carr of responsibility to administer and operate PSA’s centrifuge business did not violate the Agreement as a matter of law.
Second, in any case, this claim would fail even if the Agreement barred assignment of administration and operations to Carr, which it does not. “[T]he mere breach of a contract, without more, does not amount to a c. 93A violation.” Madan v. Royal  Indem.  Co.,  26 Mass.  App.  Ct.  756,  762  (1989).  A breach of contract would violate c. 93A only if “the nature, purpose, and effect of the challenged conduct is coercive or extortionate.” Diamond Crystal
 
                                                            -25-
 
Brands, Inc. v. Backleaf, LLC, 60 Mass. App. Ct. 502, 507 (2004); accord, e.g., Zabin v. Picciotto, 73 Mass. App. Ct. 141, 169 (2008), rev. denied, 453 Mass. 1103, 1105 (2009). “In the absence of conduct having that quality, a failure to perform obligations under a written lease” or other contract, “even though deliberate and for reasons of self-interest, does not” violate c. 93A. Atkinson v. Rosenthal, 33 Mass. App. Ct. 219, 226 (1992) (no c. 93A violation where tenant deliberately abandoned and thereby breached commercial lease); accord Kobayashi v. Orion Ventures, Inc., 42 Mass. App. Ct. 492, 505, rev. denied, 425 Mass. 1102 (1997) (landlord’s breach of non-competition clause did not violate c. 93A, as plaintiff presented no evidence that landlord violated lease “to gain an economic advantage” over tenant “or to extort a concession”).
8.4. “Misrepresentation” Theory. Count VIII asserts that PSA made false representations about its UFMini device with intent of misleading Plaintiffs as to whether that device would compete directly with the UniFuge device, and therefore constitute a “Triggering Event” that would shift control of the transferred technology back to BTCG.
The Court will deny the request to dismiss this claim as against PSA. This claim alleges that PSA engaged in far more than a mere breach of contract. Instead, Plaintiffs contend that PSA induced BTCG not to declare that a Triggering Event had occurred by falsely representing that the UFMini device would not compete directly with the UniFuge device.
These allegations of fraud provide an adequate basis for the c. 93A claim against Boston Meridian. See Nota Constr. Corp. v. Keyes Assocs., Inc., 45 Mass. App. Ct. 15, 16 (1998) (plausible allegations of deliberate fraud in trade or commerce state a claim under c. 93A). Although these allegations may not be stated with the particularity needed to state a common law claim for fraud, a statutory claim that fraudulent conduct violated c. 93A is not subject to Rule 9(b) and need not be alleged with particularity. See U.S. Funding, Inc. of Am. v. Bank of Boston Corp., 28 Mass. App. Ct. 404, 407 (1990).
However, the Court will allow the request to dismiss this claim as against Barry-Wehmiller and Carr. According to the amended complaint, the alleged misrepresentations that form the basis of this claim were made by PSA. As discussed above in § 8.2 of this decision, Plaintiffs cannot lump the defendants together and assert a claim against all three of them when the underlying misconduct was allegedly committed only by PSA.
 
                                                            -26-
 
9. Accounting. Since Plaintiffs have not stated a viable claim for breach of fiduciary duty, it is not clear that they are entitled to seek a formal accounting from PSA. But the Court will allow the request to dismiss count IX on a different ground, that an accounting is an equitable remedy, not a cause of action. See, e.g., Menacker v. Overture L.L.C., 2020 WL 4453438, at *9 (Del. Ch. Aug. 4, 2020), Perlmutter v. Varone, 2018 WL 1151597, at *1 n.2 (Md. Ct. Spec. App. Mar. 5, 2018); Zaki Kulaibee Establishment v. McFliker, 771 F.3d 1301, 1310 n.21 (11th Cir. 2014) (applying Florida law); Macomber v. Travelers Property & Casualty Corp., 261 Conn. 620, 623 n.3 (2002); cf. Mullins v. Corcoran, 488 Mass. 275, 286 n.16 (2021) (“Injunctive relief is a remedy, and not a cause of action.”). The Court will therefore dismiss this claim without prejudice.
10. Claims against “PneumaticScaleAngleus Corp.” Finally, the Court will also dismiss all claims against “PneumaticScaleAngleus Corp.” Though Plaintiffs list this purported entity as a defendant, ¶ 18 of the amended complaint states that this “is a fictitious entity name and alter ego” of Pneumatic Scale Corp. Defendants agree that “PneumaticScaleAngleus Corp. was never a separate legal entity.”
Plaintiffs cannot assert claims against a trade name that never existed as a corporate entity, especially where they are separately suing the same corporation under its actual, correct name. “It is ‘well-established that a trade name can neither sue nor be sued.’ ” South Shore Hellenic Church, Inc. v. Artech Church Interiors, Inc., 183 F. Supp. 3d 197, 213 (D. Mass. 2016) (O’Toole, J.), quoting Diesel Machinery, Inc. v. Manitowoc Crane Group, 777 F.Supp.2d 1198, 1213 (D.S.D.2011) (collecting cases); accord Steel v. Hahn Prop. Mgmt. Corp., 1994 WL 69527, at *1 (7th Cir. 1994) (“you can't sue a trade name”) (unpublished order).
A civil plaintiff may sue an unknown defendant “by a fictitious name” (such as “John Doe”); doing so “shall not be grounds for dismissal” so long as the actual defendant is identified in an amended complaint and served with process in a timely manner. See G.L. c. 223, § 19.
But that is not what Plaintiffs are doing here. They have sued a known and named corporate defendant by its true name (Pneumatic Scale Corp.) and also by its fictitious trade name (PneumaticScaleAngleus Corp.). That is improper and confusing.
 
                                                            -27-
 
ORDER
The claims asserted by Impact Technology Licensing, LLC, for breach of contract in counts I, V, and XII of the Plaintiffs’ amended complaint are dismissed without prejudice for lack of subject matter jurisdiction, on the Court’s own motion.
Defendants’ partial motion to dismiss some but not all of Plaintiffs’ other causes of action is allowed in part with respect to the following claims. The claim seeking an accounting in count IX is dismissed without prejudice because an accounting is an equitable remedy, not a cause of action. The following claims shall be dismissed with prejudice when final judgment enters:
o          so much of count I in which Boston Technology Consultants Group, Inc., claims that PSA breached their Technology Transfer Agreement (the “Agreement) by (I) stopping royalty payments before all covered patents have expired, in alleged violation of the original terms of the Agreement; (ii) stopping royalty payments before all covered patents have expired, in alleged violation of a purported modification of the Agreement; or (iii) assigning PSA’s rights and obligations under the Agreement without Plaintiffs’ consent;
o          so much of count II that asserts Barry-Wehmiller Companies, Inc. or CARR Biosystems, LLC, violated G.L. c. 93A on a “stringing along” theory;
o          the claim in count III that defendants violated G.L. c. 93A by purportedly assigning contractual rights in violation of the contract;
o          the unjust enrichment claim in count IV;
o          the claim for breach of fiduciary duty in count VI;
o          the tortious interference claim in count VII;
o          so much of count VIII that asserts Barry-Wehmiller Companies, Inc., or CARR Biosystems, LLC, violated G.L. c. 93A by making misrepresentations;
o          the claim for aiding and abetting an alleged breach of fiduciary duty in count X; and
o          the “promissory estoppel” claim in count XIV.
 
                                                            -28-
 
Any other claims against the fictitious entity “PneumaticScaleAngleus Corp.” are dismissed without prejudice. This does not affect any remaining claims against Pneumatic Scale Corp. or Pneumatic Scale Angelus, LLC.
Defendants’ partial motion to dismiss is denied in part with respect to:
o          so much of count I in which Boston Technology Consultants Group, Inc., claims that PSA breached the Agreement by stopping royalty payments in February 2024 even though there had not been an “expiration” of any covered patent;
o          so much of count II asserting that PSA (but not the other defendants) violated G.L. c. 93A on a “stringing along” theory;
o          the claim by Boston Technology Consultants Group, Inc., in count V that PSA breached the Agreement by failing to maintain a particular Russian patent; and
o          so much of the claim in count VIII asserting that PSA (but not the other defendants) violated c. 93A by making misrepresentations.
/s/Kenneth W. Salinger Justice of the Superior Court
March 7, 2025